In the Matter of: The Application of Midwestern Fidelity Corporation To Acquire Beneficial Ownership of More Than 10 Percent of the Capital Stock of Zemarc, Ltd., Appellant. Commonwealth of Pennsylvania, William J. Sheppard, Pennsylvania Insurance Commissioner, Insurance Department. Midwestern Fidelity Corporation, Intervening Appellee.

Argued June 9, 1976, before President Judge BOW-
MAN and Judges CRUMLISH, JR., WILKINSON, JR., MEN-
CER and BLATT. Judges KRAMER and ROGERS did not
participate.

*Tom P. Monteverde,* with him, of counsel, *Pelino,
Wasserstrom, Chucas & Monteverde,* for appellant.

*John H. Isom,* Assistant Attorney General, with
him *Andrew F. Giffin,* Assistant Attorney General,
for appellee.

*John S. Stith,* with him *Thomas J. Gardner,* and, of counsel, *Frost & Jacobs; Robert L. Rubendall;* and *Metzger, Hafer, Keefer, Thomas and Wood,* for intervening appellee.

OPINION BY JUDGE MENCER, August 31, 1976:

This case had its genesis in an application by Midwestern Fidelity Corporation (MFC) to the Pennsylvania Insurance Commissioner (Commissioner) seeking approval, pursuant to Section 337.6 of The Insurance Company Law of 1921 (Insurance Company Law), Act of May 17, 1921, P.L. 682, *as amended,* 40 P.S. §459.6, of MFC's proposed acquisition of beneficial ownership of more than 10 percent of the capital stock of Zemarc, Ltd. (Zemarc), a Pennsylvania insurance corporation.[1]

After a considerable number of hearings, during which the present management of the appellant Zemarc vigorously opposed the petition,[2] the Commis-

---

[1] Zemarc is a Pennsylvania insurance holding company which owns more than 66 2/3 percent of the capital stock of North American Investors Life Insurance Company (NAIL) and Mid-Continent Insurance Company.

MFC is a financial holding company organized under the laws of Ohio. It owns Midwestern Indemnity Company, together with its wholly-owned subsidiary, Mid-American Fire & Casualty Co. At the time of the application, MFC also owned the Miami Deposit Bank, the Buckeye Savings Association (formerly merged with Keystone Savings Association), the Investors Fidelity Life Insurance Company (IFLIC) (acquired through merger of Land-Del Corporation, a formerly wholly-owned subsidiary of MFC). Actually, MFC intends to use IFLIC as the acquiring corporation in the Zemarc purchase.

[2] We note that it is MFC's of-record intention to replace Zemarc's present management. Other facts of record reveal that Zemarc's present management has only recently gained control from the former management which has allegedly sold its stock to MFC or otherwise given control thereof to MFC and which has allegedly encouraged MFC's petition.

sioner, on December 1, 1975, issued his order granting approval to MFC's proposed tender. Zemarc subsequently petitioned for reconsideration and rehearing. It is from the denial of that petition and the order of December 1, 1975 that this appeal is taken.

As amended, Section 337.6 of the Insurance Company Law provides in relevant part:

"(b) Without first complying with all applicable provisions of this section:

"(1) No person shall, directly or indirectly through an intermediary or otherwise, acquire or offer to acquire beneficial ownership of insurance stock or insurance holding company stock if such acquisition (together with any past or proposed acquisitions from others) would cause such person to have beneficial ownership of more than ten per centum (10%) of the outstanding insurance stock or insurance holding company stock of any class of any issuer, . . . and

"(3) No person shall, directly or indirectly through an intermediary or otherwise, acquire or offer to acquire beneficial ownership of insurance stock or insurance holding company stock pursuant to a plan whereby such person would become the beneficial owner of more than ten per centum (10%) of the outstanding insurance stock or insurance holding company stock of any class of any issuer . . . .

"(c) There shall be filed with the Insurance Commissioner a statement, signed by the person proposing to make the acquisition, and verified by oath or affirmation, which shall contain the information specified in this subsection, and copies of all material proposed to be used in connection with the offer or acquisition (which shall set forth the information contained in the statement filed with the Insurance Commissioner), copies of which statement and material and all amendments thereto, shall simultaneously

with such filing, also be sent by registered or certified mail to the issuer of the insurance stock or insurance holding company stock proposed to be acquired. The statement filed with the Insurance Commissioner shall be filed on such form or forms, if any, as the Insurance Commissioner shall prescribe, and shall contain the following information and such additional information as the Insurance Commissioner shall by regulation prescribe as appropriate to enable him to make a determination under subsection (d) of this section:

"(1) The name and address of each person who proposes to acquire or offer to acquire insurance stock or insurance holding company stock, and (i) if such person is an individual, his principal occupation during the past five (5) years, or (ii) if such person is not an individual, an informative description of the business done and intended to be done by such person and such person's subsidiaries and the general development of such business during the past five (5) years.

"(2) If such person is not an individual, a list of all persons who are directors or executive officers of such person, or who perform similar functions, and all persons who have been chosen to become directors or executive officers or to perform similar functions, but who have not yet assumed their positions. The list shall include all positions and offices held by the persons named in the particular organization and their principal occupations during the past five (5) years.

"(3) The terms and conditions of any proposed offer and acquisition and the manner in which such offer and acquisition are to be made.

"(4) The source of the funds to be used in the proposed acquisition, and, if the funds are to be bor-

rowed, the name or names of the lender or lenders and a summary of the terms and conditions of the loan transactions.

"(5) Such plans, arrangements, understandings and intentions as such person may have for the future business and management of the issuer whose capital stock is to be acquired and, if such issuer is an insurance holding company, of the insurance company sixty-six and two-thirds per centum (66 2/3%) or more of whose capital stock of any class is beneficially owned by such insurance holding company, including any plans, arrangements, understandings or intentions with respect to total or partial liquidation, sale of assets, merger, material change in business, corporate structure, management or composition of the board of directors.

"(6) The number of shares of each class of insurance stock or insurance holding company stock proposed to be acquired which are beneficially owned by the person proposing to acquire or offer to acquire insurance stock or insurance holding company stock, as the case may be, or which are subject to rights of acquisition by such person, the dates of any sales and purchases of such stock by such person and each associate of such person within the past two years, and the prices received or paid in connection with such sales and purchases.

"(7) Information as to any contracts, arrangements or understandings with any person with respect to any securities of the insurance company or insurance holding company whose capital stock is to be acquired, including but not limited to contracts, arrangements or understandings with respect to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits,

division of losses or profits, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, or understandings have been entered into, and giving the details thereof.

"(8)  A consent to service of process if required by subsection (e) of this section.

"(9)  Complete audited statements as to the earnings and financial condition of such person for the preceding five (5) fiscal years of such person and similar unaudited information as of a date not more than ninety (90) days prior to the filing of the statement with the commissioner.

"(d)  If the Insurance Commissioner shall determine:

"(1)  That the statement and other material filed pursuant to subsection (c) of this section comply with the requirements of subsection (c) of this section and any regulations promulgated thereunder;

"(2)  That he has no reason to believe that after such acquisition the insurance company whose capital stock is to be acquired or sixty-six and two-thirds per centum (66 2/3%) or more of whose outstanding capital stock of any class is beneficially owned by the insurance holding company whose capital stock is to be acquired will not continue to comply in all respects with the laws and regulations of this Commonwealth governing insurance;

"(3)  That, upon completion of the acquisition, the insurance company whose capital stock is to be acquired or sixty-six and two-thirds per centum (66-2/3%) or more of whose outstanding capital stock of any class is beneficially owned by the insurance holding company whose capital stock is to be acquired would satisfy the requirements for the issuance of a license to write the line or lines of insurance which it is presently licensed to write in this Commonwealth;

"(4)    That the effect of the acquisition will not be substantially to lessen competition in insurance in this Commonwealth or to tend to create a monopoly therein;

"(5)    That the financial condition of the person proposing to make the acquisition is not such as might jeopardize the financial stability of the insurance company whose capital stock is to be acquired or sixty-six and two-thirds per centum (66 2/3%) or more of whose outstanding capital stock of any class is beneficially owned by the insurance holding company whose capital stock is to be acquired, or prejudice the interests of the policyholders of such insurance company or, in the case of an acquisition of control other than by merger or consolidation, prejudice the interests of any remaining shareholders of such insurance company who are unaffiliated with the person proposing to make the acquisition;

"(6)    That the plans or proposals which the person proposing to make the acquisition has to liquidate the insurance company whose capital stock is to be acquired or sixty-six and two-thirds per centum (66 2/3%) or more of whose outstanding capital stock of any class is beneficially owned by the insurance holding company whose capital stock is to be acquired, to sell the assets of such insurance company or to merge or consolidate it with any person, or to make any other material change in its business or corporate structure or management, are fair and reasonable to its policyholders and shareholders;

"(7)    That the competence, experience and integrity of those persons who control or manage the person proposing to make the acquisition and of those persons who would control or manage the operation of such insurance company indicate that it would be in the interest of the policyholders and shareholders

of such insurance company and of the general public to permit such acquisition to be made;

"(8) That the interests of the policyholders, shareholders and general public would not otherwise be prejudiced or impaired;

he shall so notify the person filing the statement, the issuer whose stock is proposed to be acquired, and, if such issuer is an insurance holding company, the insurance company sixty-six and two-thirds per centum (66 2/3%) or more of whose outstanding capital stock of any class is beneficially owned by such insurance holding company, and such a determination is hereafter referred to as an approving determination. Notice shall also be given by the Insurance Commissioner of any determination which is not an approving determination. If an approving determination is made by the Insurance Commissioner, and not otherwise, the proposed offer and acquisition may thereafter be made and consummated on the terms and conditions and in the manner described in the statement, and subject to such conditions as may be prescribed by the Insurance Commissioner as hereinafter provided. An approving determination by the Insurance Commissioner shall be deemed to extend to offers or acquisitions made pursuant thereto within one (1) year following the date of determination. The Insurance Commissioner may, as a condition of his approving determination, require the inclusion in any offer of provisions requiring the offer to remain open a specified minimum length of time, permitting withdrawal of shares deposited prior to the time the offeror becomes bound to consummate the acquisition, and requiring pro rata acceptance of any shares deposited pursuant to the offer. The Insurance Commissioner shall hold a hearing before making the determination required by this subsection if, within

ten (10) days following the filing with the Insurance Commissioner of the statement called for by subsection (c), written request for the holding of such hearing is made either by the person proposing to make the acquisition, by the issuer whose stock is proposed to be acquired, or, if such issuer is an insurance holding company, by the insurance company sixty-six and two-thirds per centum (66 2/3%) or more of whose outstanding capital stock of any class is beneficially owned by such insurance holding company. Otherwise the Insurance Commissioner shall determine in his discretion whether such a hearing shall be held. Sixty (60) days notice of any such hearing shall be given to the person proposing to make the acquisition, to the issuer whose stock is proposed to be acquired and, if such issuer is an insurance holding company, to the insurance company sixty-six and two-thirds per centum (66 2/3%) or more of whose outstanding capital stock of any class is beneficially owned by such insurance holding company. Notice of any such hearing shall also be given to such other persons, if any, as the Insurance Commissioner may determine.

. . . .

"(f)    Any hearing held pursuant to any provision of this section shall be conducted, and the determination of the Insurance Commissioner shall be rendered, in accordance with the provisions of the act of June 4, 1945 (P.L. 1388), as amended, known as the 'Administrative Agency Law' [71 P.S. §1710.1 et seq.] relating to adjudication procedure.

. . . .

"(h)    No solicitation or recommendation for the acceptance of any offer made pursuant to this section shall be made in contravention of any rules and regulations which the Insurance Commissioner may adopt.

"(i)    No person who acquires or offers to acquire insurance stock or insurance holding company stock

pursuant to this section shall make in connection therewith any false, deceptive or misleading statement, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or engage in any act or practice which is fraudulent, deceptive or manipulative.

. . . .

"(k) Any person who shall knowingly make or cause to be made any false statement in any statement or other document filed with the Insurance Commissioner under this section, or who shall violate any provision of subsection (b), (c), (d), (h), or (i) of this section, shall be guilty of a misdemeanor, and, upon conviction thereof, shall be sentenced to pay a fine of not more than five thousand dollars ($5,000) or imprisonment for not more than five (5) years, or both: Provided, however, That no broker-dealer whose participation in an offer or acquisition is limited to the performance of the customary broker's function in transactions effected on a stock exchange or in the over-the-counter market, who receives no more than the customary broker's commission, who does not solicit or arrange for the solicitation of orders to sell shares of capital stock of the corporation whose shares are being purchased and who has no knowledge that his principal has solicited or arranged to solicit any such orders shall be deemed guilty of any violation of this section, but the aforesaid exemption of the broker-dealer shall not exempt his principal."

Initially then, we are compelled to examine MFC's application, as subsequently amended during the course of the hearings, and the Commissioner's adjudication to determine whether the Commissioner was correct in ruling, pursuant to subsection (d), clause

(1), that MFC has submitted the application in compliance with the provisions of subsection (c).[3]

A reading of MFC's amended application must compel the conclusion that, at least on its face, it meets all the prerequisites of subsection (c). Indeed, MFC numbered the sections of its original application in conformance with the contents required by the numbered clauses of subsection (c). The Commissioner, in exercising the duties imposed by subsection (d), clause (1), set forth a number of findings of fact indicating that the application conforms with subsection (c). Appellant seems to concede the surface validity of the petition but nevertheless argues its underlying invalidity, alleging that it incompletely discloses and intentionally misleads. Appellant seems to contend that each statement in the petition must be supported by substantial evidence in the record which in turn must then form the basis for detailed findings of fact and conclusions of law on the part of the Commissioner. Such is not the law.

Subsection (d), clause (1), merely requires the Commissioner to determine that the contents of the filing meet the minimal standards of information required by subsection (c) and the regulations.[4] The intent of subsection (c) is to provide a source of information that might subsequently be found necessary to use in subsection (d) determinations. It is

---

[3] Our scope of review here is prescribed by Section 44 of the Administrative Agency Law, Act of June 4, 1945, P.L. 1388, *as amended*, 71 P.S. §1710.44; therefore, the adjudication of the Commissioner must be affirmed unless it is not in accordance with the law or unless it constitutes an arbitrary, capricious, or unreasonable determination due to the absence of substantial evidence to support his findings.

[4] The sparse regulations applicable here, in essence, repeat the statutory law and impose no additional burdens on a petitioner. *See* 31 Pa. Code §25.1 et seq.

sworn to, and a remedy for fraudulent or misleading statements is provided for in subsection (k). Subsection (d) determinations are to be made solely by the Commissioner. After carefully examining the submission, we cannot conclude that the Commissioner was arbitrary or capricious in approving the submission as being consistent in all material respects with the disclosure requirements. In so holding, we are aware of certain admitted technical deficiencies in the submission, but we are not convinced that these deficiencies, accepted by the Commissioner, can form the basis for sustaining appellant's challenge.

Appellant has objected to the Commissioner's basis for his validation of the petition, in light of the other requirements of subsection (d). Specifically, appellant contends that the evidence amassed below must necessarily lead to the conclusion that MFC is in violation of the strictures imposed by clauses (2), (3), (5), (6), (7), and (8) of subsection (d). We shall examine each of these clauses in relation to the record and the Commissioner's adjudication.

### Subsection (d), Clauses (2) and (3)

Appellant's main contention in regard to possible violations of clauses (2) and (3) concerns certain insurance policies and provisions written and issued by IFLIC in Alabama. The Commissioner set forth three findings of fact on this subject, detailing the types of objectionable policies offered by IFLIC, the wording thereof, and the current plans of IFLIC for the discontinuation of these policies. Among the matters found to be objectionable under the laws of the Commonwealth were the use of the phrases "legal reserve" and "old line reserve" and the issuance of life policies containing a series of pure guaranteed annual endowments evidenced by coupons, passbooks, or similar items. However, the Commissioner noted:

"The evidence in the record is that these policies were developed prior to IFLIC's acquisition by MFC, and were also prior to the assumption of control by present IFLIC management. The evidence further indicates that while some of these policies were still being sold as of the close of testimony, a new policy and rate book had been developed and a transition to a more standardized line of business was being carried out. Need and motivation for this transition may possibly be open to some question, but the direction is clear.

"Counsel for MFC correctly argued that what happened to IFLIC prior to MFC's acquisition of control has no bearing on whether NAIL can reasonably be expected to remain in compliance with the Pennsylvania Insurance laws and regulations. This is particularly true in light of the evidence of the direction of change since its acquisition by MFC. Moreover, Section 354 of The Insurance Company Law (40 P.S. §477d) grants the Insurance Commissioner sufficient approval power over insurance forms and contracts. Should MFC desire to have similar policies approved for use by NAIL, the legality of such policies under Pennsylvania insurance laws and regulations could then be conclusively determined."

Appellant strenuously objects to these conclusions. While we are not convinced that IFLIC's former practice would have no bearing on the issue at hand,[5] we cannot here state that the Commissioner was arbitrary or capricious or committed an error of law in his conclusions. Ameliorating factors, such as a change in

[5] Surely, if IFLIC's former practices were fraudulent or intentionally deceptive, such practices should be considered by the Commissioner in determining whether or not IFLIC could be expected to make a conscientious effort to conform to Pennsylvania law. However, in the instant case, the practices were approved as legal by the insurance authorities in Alabama.

ownership or management, subsequent administrative review, and management representations are factors to be considered. Since the above conclusions are based on findings of fact supported by sufficient evidence in the record, we are compelled by law to uphold the Commissioner's determination.

### Subsection (d), Clauses (5), (6), and (8)

Considerable conflicting evidence was presented below concerning the financial conditions of MFC and its subsidiaries (particularly IFLIC), the acquisition plans, and the possibilities of merger, consolidation, or even liquidation of Zemarc. Appellant is fearful of a raid by MFC on the corporate treasury of Zemarc that would significantly impair the interests of Zemarc, its remaining shareholders, and its policyholders. Appellant especially contends that such a raid by MFC (through the use of IFLIC) would be necessary in order for MFC to be able to finance its acquisition of Zemarc, and therefore the petition is in violation of the law.

Initially, we consider appellant's concern for the nonparticipating stockholders of Zemarc. Appellant sets forth in its brief in some detail an analysis of evidence presented below which it alleges tends to show that the stockholders of IFLIC, at the time of the acquisition of that company by MFC, received, because of alleged deceitful and fraudulent maneuverings of MFC, less than adequate and fair value for their IFLIC shares. This type of information is relevant in that it may reveal the intentions of the potential acquirer and therefore bears on what can be expected of MFC after acquisition of the controlling interest in Zemarc. Additionally, appellant presented below and traced in its briefs in some detail evidence concerning the financial status of Zemarc and NAIL. Among facts specifically emphasized by

appellant was evidence that the former selling price of Zemarc was as high as $12 per share, that Zemarc had an alleged book value of over $4 per share, that a majority of Zemarc's stockholders and all of its directors were against the merger, and that Zemarc had just expelled corrupt management and was now on the road to a new recovery.

While such evidence can be considered persuasive, it is not controlling. Conflicting evidence was presented below and, since conflicting conclusions can easily be drawn therefrom, the law logically leaves questions concerning credibility and the weighing of evidence to the experienced administrative authority, here the Commissioner.

The Commissioner concluded as follows:

"MFC's proposed tender offer is for the purchase of Zemarc shares at $2.00 per share. Zemarc challenges the price as grossly inadequate. Since the only result of favorable action on the instant application would be the opportunity for Zemarc shareholders to consider MFC's offer, the purchase price would only be a basis for disapproval where it were necessary to prohibit the offer as manifestly contrary to interests of the shareholders to sell at such price.

"Evidence indicated that trading in Zemarc stock in the months following the initial MFC application (May to November, 1974) was sparse. It disclosed that the bid price fluctuated between $.50 and $1.25 per share in that period, while asked price varied from $1 to $2 per share.

"The $2 tender offer price is, however, considerably below the book value placed on the shares by both MFC and Zemarc witnesses. These estimates ranged from $3.78 per share by William Calhoun [sic] to $4.28 projected by Wilson Punshon, CPA for Zemarc.

"When Zemarc's recent corporate difficulties are considered, the variance between the tender offer

price and book value becomes understandable. The market value of a stock reflects its discounted earning streams, and that projection may well be open to question. Two dollars per share is more than Zemarc shareholders could have received for their shares in the recent open market. It is an offer the reasonableness of which individual shareholders can evaluate for themselves, and their response will dictate the adequacy of the consideration and the success of the tender offer."

Appellant strenuously objects to the above as allegedly evidencing the Commissioner's abdication of his responsibilities under the statute and as being unsupported in the findings of record. We must agree that, at least at first glance, the last sentence quoted above may be violative of a statutory duty imposed on the Commissioner. The statute, by implication at least, requires the Commissioner to determine that the offer of the acquirer is fair to the stockholders of the target company. However, the Commissioner's conclusion that the final decision as to the reasonableness of the offer is best left to the individual stockholders is supported by sound reasoning. This is especially true since the statute does not explicitly demand a separate finding as to the fairness of the tender. In his numbered conclusions, the Commissioner noted:

"11. The interest of the policyholders, shareholders and general public will not be otherwise prejudiced or impaired by the proposed tender offer."

In light of this statement, supported by the record, and its direct response to the legal issue posed by the statute, we cannot hold that the Commissioner erred in his conclusion.

The main thrust of appellant's arguments concerns itself with two of the Commissioner's numbered conclusions of law. These provide:

"8. There is no reason to believe that the financial condition of MFC or its subsidiaries would jeopardize the financial stability of Zemarc or its insurance subsidiaries or prejudice the interests of their policyholders or shareholders unaffiliated with MFC.

"9. There is no reason to believe that any plans and proposals of MFC to liquidate, sell, merge, consolidate or otherwise materially change the business or corporate structure or management of Zemarc, or its insurance subsidiaries would not be fair and reasonable to its policyholders and shareholders."

Appellant strenuously objects to these conclusions, alleging that they reveal that the Commissioner incorrectly placed the burden on it to disprove MFC's allegations of statutory compliance. We have closely examined the statute and are of the opinion that, in light of the purpose, intent, and language of the act, the Commissioner committed no error of law in setting forth these conclusions. These conclusions represent merely a restatement of the statutory requirement. The challenge provisions of subsection (d) imply at least an initial burden placed on a challenger to overcome the legally implied validity of any portions of a petition submitted and approved by the Commissioner. It is incumbent upon one seeking further review of a proposal to persuade the Commissioner that additional facts are likely to have a material impact on the outcome of the proceeding. In essence, here the Commissioner has merely stated that he has failed to accept appellant's proffered testimony as forming a credible basis for a need for further review of the petition. On their face then the numbered conclusions of law must stand.

Appellant has also challenged these conclusions on substantive grounds, alleging a lack of findings of fact in support thereof and a lack of evidence in the

record to support the findings of fact and the conclusions. One specific objection is the allegation that the financial condition of MFC and IFLIC is such that they could obtain control of Zemarc only with borrowed moneys and could repay the loans only at the expense of the Zemarc stockholders and policyholders. In support of this allegation, appellant points to considerable evidence in the record from which it has drawn a number of conclusions relevant to the financial status of MFC and its subsidiaries. This Court has analyzed appellant's allegations, and we have been impressed by appellant's computations and analysis, but, within the scope of our review responsibilities, we will affirm the Commissioner.

In its amended application, MFC noted the following:

"*Source of Funds.*

"If all shares of Zemarc issued and outstanding, other than shares already owned by IFLIC, are tendered pursuant to the anticipated cash tender offer (referred to in Item 3), the maximum amount of funds required by Midwestern (excluding fees, commissions and expenses) will be approximately $2,546,878. This amount will be obtained as follows:

"(a) Approximately $800,000 will be provided from the cash accounts of IFLIC and from funds provided by the sale of various investments owned by IFLIC.

"(b) Midwestern has obtained a commitment from The Central Trust Company of Cincinnati, Ohio, ("Central") under the terms of which Central will make $1,750,000 available to Midwestern to purchase shares of Zemarc on terms comparable to an existing revolving credit agreement between Midwestern and Central. Under the terms of said revolving credit agreement, Central agrees to make loans to Midwestern (Revolving Credit Loans) until June 1, 1976.

Each Revolving Credit Loan is payable on or before June 1, 1976, bearing interest payable quarterly at a rate per annum of 1/2 of 1% above the prime rate of interest then in effect. For all periods during which such prime rate is 7 1/2% per annum or above, the Loan bears interest at a rate per annum of 1/4 of 1% above the prime rate. On June 1, 1976, Central will make a loan to Midwestern ("Term Loan") in an amount equal to the principal balance of the Revolving Credit Loan. The Term Loan shall bear interest at a rate per annum of 3/4 of 1% above the prime rate. For all periods during which such prime rate is 7 1/2% per annum or above, the Term Loan shall bear interest at a rate per annum of 1/2 of 1% above such prime rate. The principal balance shall be payable on June 1, 1978. A copy of the Commitment Letter from Central, Revolving Credit Loan Agreement and sample copies of a Revolving Credit Note and Term Loan are enclosed herewith as Exhibit 3."

The Commissioner entered a number of findings and conclusions that in essence accept the contents of the application as a credible statement of the proposed source of funding. Considerable testimony was presented by both sides on the issue of MFC's ability to retire the Central loan. The matter therefore became one of evaluation and we remain mindful that the law requires us to defer to the expertise of the administrative authorities in such situations.[6] MFC's corporate structure necessarily allows for considerable flexibility in financing the IFLIC takeover. The Com-

---

[6] Again, we note that appellant's objections to a lack of exhaustive findings of fact have no merit. The courts of this Commonwealth have never held that an administrative agency must set forth findings specifically noting the rejection, and reasons for such rejection, of each and every minor allegation of a party. A voluminous record does not create, by its bulk alone, a multitude of real issues demanding individual attention by the Commissioner.

missioner recognized the realities of that flexibility and ruled accordingly.

Another specific objection of appellant concerns the alleged lack of evidence needed to reach the conclusion that the proposed disposition of Zemarc would be fair to the policyholders and shareholders of Zemarc and its subsidiaries. In essence, appellant complains that MFC has misled the Commissioner and has withheld pertinent information concerning the details of a future merger. The Commissioner properly held that any subsequent merger application could be reviewed with the full record of this proceeding available to him.

MFC was quite candid in its application when it stated:

*"Plans, Arrangements, Understandings and Intentions*

"It is the present intention of Midwestern to place at least one representative on the Board of Directors of Zemarc as soon as it becomes possible to do so, either through the acquisition of shares of common stock or otherwise. Upon acquisition of working control of Zemarc, it is the present intention of Midwestern to cause William Calhoon, presently President of IFLIC, to be elected also as President and chief executive officer of North Atlantic Investors Life Insurance Company ("NAIL"), a wholly-owned subsidiary of Zemarc. It is also the present intention of Midwestern that eventually Zemarc will be merged into Land-Del; IFLIC will be merged into NAIL, and Mid-Continent Insurance Company, a wholly-owned subsidiary of Zemarc, will become a wholly-owned subsidiary of The Midwestern Indemnity Company, which in turn is a wholly-owned subsidiary of Midwestern. Other than the changes described above, Midwestern does not contemplate any material changes in the businesses, corporate structures, management or com-

position of the Boards of Directors of Zemarc or its subsidiaries."

Nevertheless, appellant strenuously objects to the lack of specific information concerning the details of the manner of any future mergers. While we might agree that MFC, in the defense of its petition, could have added more specificity, we do not find that the Commissioner erred in upholding the petition in light of the evidence presented. The Commissioner accepted MFC's explanation that mergers were too remote in time and intent for it to present any detailed descriptions concerning the manner of future acquisition. Common knowledge of business practices lends considerable credibility to MFC's explanation. Additionally, the Commissioner placed considerable reliance on the fact that any future merger would be subject to other stringent controls by his department and other administrative agencies.

Appellant's detailed objections to the Commissioner's findings must be overruled. Appellant's statement that credibility is a "straw issue" misses the whole point of the administrative process. We find it incongruous for appellant to continually stress the importance of its witnesses' testimony while arguing against the testimony of MFC's witnesses and then contend that credibility is not the issue here.

## Subsection (d), Clause (7)

Finally, appellant objects to the Commissioner's 10th conclusion:

"10. There is no reason to believe that the interests of the policyholders or shareholders of Zemarc's insurance subsidiaries or the general public would be adversely affected by the competence, experience or integrity of those proposed to control Zemarc's insurance subsidiaries."

Again, we have carefully examined the record and find sufficient evidence in support of this conclusion. Both sides presented considerable evidence, which we shall not list at length, concerning the qualifications of their respective management personnel. It was for the Commissioner to determine whether MFC's management would adversely affect the interests of the policyholders or shareholders of Zemarc's insurance subsidiaries or the public. We find no reason on this record to disturb that determination.

We are convinced that the Commissioner committed no error of law in his adjudication. This case was thoroughly contested by present Zemarc management who fear an imminent loss of their positions. While we recognize their plight, we hold the opinion that MFC has met the requirements imposed by the law. We therefore enter the following

ORDER

AND Now, this 31st day of August, 1976, the order of William J. Sheppard, Insurance Commissioner, relative to the application of Midwestern Fidelity Corporation, filed pursuant to Section 337.6 of The Insurance Company Law of 1921, is hereby affirmed. Accordingly, the application of Midwestern Fidelity Corporation to acquire additional voting securities of Zemarc, Ltd., is granted, subject to the condition that Midwestern Fidelity Corporation agree to accept any shares tendered by Pennsylvania shareholders on a pro rata basis in the event that it decides not to accept all shares tendered and, further, that, simultaneous with the use of any tender offer material provided to Zemarc shareholders, copies of such material be filed with the Pennsylvania Insurance Department which comply in all respects with the requirements of Section 337.6 of The Insurance Company Law of 1921.