UGI Corporation, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Mark P. Widoff, Consumer Advocate, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

70

Argued September 11, 1979, before President Judge BOWMAN and Judges WILKINSON, JR., ROGERS, BLATT, DISALLE, CRAIG and MACPHAIL. Judges CRUMLISH, JR. and MENCER did not participate.

*Kenneth R. Myers,* with him *Frank M. Thomas, Jr., John R. Doubman, Jr.,* and, of counsel, *Morgan, Lewis & Bockius,* for petitioner, UGI Corporation.

*David A. Ody,* Assistant Consumer Advocate, and *David L. Kurtz,* Assistant Consumer Advocate, for respondent, Mark P. Widoff.

*Gilbert L. Hamberg,* Assistant Counsel, with him *Steven A. McClaren,* Deputy Chief Counsel, and *George M. Kashi,* Chief Counsel, for respondent.

OPINION BY JUDGE ROGERS, January 25, 1980:

UGI Corporation (UGI), a public utility providing gas service to about 200,000 customers in eastern and south central Pennsylvania, filed Supplement No. 42 to Tariff Gas—PA PUC No. 3 designed to produce additional annual revenues of $12.6 million, an increase of 9.5% over existing rates. The test year was the twelve month period ending March 31, 1978. Complaints against the proposed new rates were filed by three customers and the Office of Consumer Advocate (OCA). The Pennsylvania Public Utility Commission (PUC) suspended operation of the proposed rates and ordered that hearings be held regarding their lawfulness.

Administrative Law Judge JOSEPH L. COHEN conducted 19 days of evidentiary hearings and three days of public comment hearings and thereafter issued a Recommended Decision in which he found that UGI had justified $5,786,600 of the proposed increase of annual revenues. Exceptions were filed by all of the parties. PUC eventually entered an order approving rates designed to produce additional annual revenues of only $4,602,554.

Denial by the PUC of approximately $8,000,000 of the rate relief sought by UGI was effected by reductions in UGI's claimed fair value rate base, adjustments in the computation of rate of return and the disallowance of numerous items of claimed expense. Only UGI and OCA have filed petitions for review from the order. UGI has presented eight questions for our consideration and OCA four.

Our scope of review is "limited to a determination of whether constitutional rights have been violated, an error of law committed or whether the findings, determinations or order of the Commission are supported by substantial evidence." *U.S. Steel Corp. v.*

*Pennsylvania Public Utility Commission,* 37 Pa. Commonwealth Ct. 195, 201, 390 A.2d 849, 853 (1978).

We shall first examine the questions presented by UGI.

### UGI's Appeal—UGI's Claim For The Inclusion of Depreciation Deficiency in Either Rate Base or Operating Expense

UGI and the Commission agree that UGI, at the end of its test year, had calculated depreciation[1] for its plant-in-service of $42,806,619 and that it had booked depreciation in the amount of $37,578,987, resulting in a $5,427,632 depreciation reserve deficiency.[2] UGI contends that PUC's failure to include this depreciation deficiency in either UGI's rate base or as an operating expense will prevent it from recovering the full cost of its property devoted to the public service and was thus an error of law.

A utility seeking to recover a depreciation deficiency from rates has the burden of proving that the deficiency is genuine. *Pennsylvania Power & Light*

---

[1] Calculated depreciation represents the amount of depreciation which should have accrued to date if actual service life, as opposed to the estimated service life upon which yearly depreciation allowances were based, was known when the depreciable equipment was purchased and the taking of the depreciation allowance begun. Calculated depreciation is one of the products of reserve requirement studies, described in detail by Judge KRAMER in *Pennsylvania Power & Light Company v. Pennsylvania Public Utility Commission,* 10 Pa. Commonwealth Ct. 328, 311 A.2d 151 (1973).

[2] A depreciation reserve deficiency occurs when calculated depreciation exceeds book depreciation. In rate case terms, it is said that in such case the utility has underestimated the service life of its property and has failed over the years to claim and receive in rates an amount equal to its true expense on account of depreciation. Of course, the failure to book full depreciation increases the remaining value of property which in a rate case increases the utility's return on value.

*Co. v. Pennsylvania Public Utility Commission,* 10 Pa. Commonwealth Ct. 328, 339, 311 A.2d 151, 158 (1973). The genuineness of a deficiency is proved by the utility's demonstrating that it has not received revenues sufficient to pay all of its operating expenses together with a fair return on its rate base during the years when the deficiency was created. *See generally, U.S. Steel Corp. v. Pennsylvania Public Utility Commission, supra,* 37 Pa. Commonwealth Ct. at 212-19, 390 A.2d at 858-61; *Pennsylvania Power & Light Co. v. Pennsylvania Public Utility Commission, supra,* 10 Pa. Commonwealth Ct. at 339-42, 311 A.2d at 158-59.

UGI advances two theories in support of recovering its asserted depreciation deficiency. Its principal argument is based primarily upon Section 1703(c) of the Public Utility Code, 66 Pa. C.S. §1703(c). Section 1703(b) provides, and its predecessor, Section 503 of the Act of May 28, 1937, P.L. 1053, *formerly* 66 P.S. §1213(b), provided, that a public utility should file statements giving the details of its computation of annual depreciation for the Commission's review and correction. Before 1976 Section 503 of the Act of May 28, 1937 provided that in rate proceedings the Commission "may give consideration to statements submitted [by the utility] hereunder, in addition to such other factors as may be relevant." In 1976, by Section 12 of the Act of October 7, 1976, P.L. 1057, the word "may" was changed to "shall". Section 1703(c) of the Public Utility Code retained the amended wording. UGI contends that the use of the mandatory shall rather than the discretionary may require the Commission to accept the utility's book figures on depreciation deficiency without any inquiry into their genuineness. Moreover, UGI contends that the party opposing its figures should have the burden to prove them wrong.

We do not believe that UGI's interpretation of the 1976 amendment was what the Legislature intended. The change from "may give consideration" to "shall give consideration" we believe was meant only to require the Commission to consider the utility's statements in rate cases, in contrast to its previous privilege of simply ignoring them. We do not discern legislative intent to overrule prior holdings that the utility must prove that its depreciation deficiency is genuine. This is not a case where a legislative overruling of case law is a "necessary incident[] or logical consequence[]" of statutory language. *Commonwealth v. Cartwright,* 350 Pa. 638, 645, 40 A.2d 30, 33 (1944), *quoting* Endlich, The Interpretation of Statutes §422. *Cf. Delaware Institution District v. Middletown Township,* 6 Pa. Commonwealth Ct. 146, 151, 293 A.2d 885, 888 (1972), *aff'd,* 450 Pa. 282, 299 A.2d 599 (1973).

Furthermore, Section 1703(c) expressly permits the Commission to consider, in addition to the utility's depreciation statements, such "other factors as may be relevant", which would be an unnecessary exercise if the Commission were bound to accept the utility's depreciation statement as correct. Section 1703(c) also states that the Commisssion *"shall not be bound* in rate proceedings to accept, as just and reasonable for rate-making purposes, estimates of annual depreciation established in the provisions of this section." (Emphasis added.) Finally, Section 1703 refers to *annual* depreciation figures. In the case at bar, UGI and the Commission are in dispute over the genuineness of the *accrued* depreciation figures which form the basis of UGI's alleged depreciation reserve deficiency. We therefore hold that Section 1703(c) has not removed the utility's burden in a rate case of proving that an alleged depreciation reserve deficiency is genuine.

UGI further contends that the Commission erred in concluding that UGI failed to prove that it did not earn its operating expenses plus a fair return on the fair value of its plant-in-service. Our scope of review in this área is limited to an examination of whether the Commission violated UGI's constitutional rights, committed an error of law, or made findings or orders which are not supported by substantial evidence. *United States Steel Co. v. Pennsylvania Public Utility Commission, supra,* 37 Pa. Commonwealth Ct. at 201, 390 A.2d at 853. In this aspect of the case, UGI raises questions concerning the propriety of the acceptance of the Commission's prosecuting staff's conclusion that UGI's book reserve included an amount for negative salvage which should be removed and that life tables should be used for UGI's steel mains effecting a reduction in its calculated reserve. These complaints, while interesting, go only to the amount of the deficiency; they do not demonstrate that the deficiency in any amount was genuine as the law in the field uses that word—that is, that during the period in which the deficiency arose UGI did not earn its operating expenses plus a fair return on the fair value of its plant-in-service.

UGI's APPEAL—TREATMENT OF UGI's UNSUCCESSFUL GAS EXPLORATION COSTS

In 1977, UGI entered into a joint venture for new gas exploration with Amoco Production Company. UGI provided an initial sum of $6.5 million for exploration and drilling with the option to invest additional sums. In return, UGI is part owner of gas wells developed with its funds, with right to a share of the wells' production and to purchase Amoco's share of gas production from the joint wells. In addition, UGI may purchase 27,000 billion cubic feet (BCF) of gas discovered by Amoco before the inception of the joint

venture. The first year of the joint venture commenced during the test year used in this case.

Prior to entering into the venture, UGI filed a petition asking the Commission for approval of some form of recovery of the costs of unsuccessful exploration and drilling. *Petition of UGI Corporation,* P-88, P.U.C. Order 2 (1977). The Commission's order stated that it would give "fair rate treatment" to "all prudent and reasonable exploratory project expenses including those incurred by the drilling of unsuccessful wells." Thereafter, during the course of gas exploration, UGI incurred net unsuccessful well costs of $1.2 million.

In presenting its case for a rate increase to the Commission, UGI did two things; it expensed the $6.5 million initial investment over 28 years, and it claimed in rate base the net unsuccessful well costs. Since a utility cannot capitalize an item in its rate base and at the same time recover the item as an expense from ratepayers, *Pittsburgh v. Pennsylvania Public Utility Commission,* 187 Pa. Superior Ct. 341, 353, 144 A.2d 648, 655 (1958), the Commission chose to allow only the amortization of $6.5 million as an expense.

UGI claims that the $1.2 million dry hole costs should have been allowed in its rate base and that the Commission's allowance of the $6.5 million investment as an amortizing expense denies UGI's stockholders a fair rate of return on their investment in gas exploration, thus shifting the risk of unsuccessful wells directly onto the shoulders of UGI's investors. UGI relies upon the Commission's prior statement that "fair rate treatment" would be given unsuccessful well costs. The Commission counters that its treatment of these expenses is proper because it directly reflects the amount of benefits, in terms of additional gas, derived by UGI customers. The Commission reasons that UGI

customers should not have to pay UGI a continuing return on an investment which might well yield no benefit to them beyond that shown in the test year. This, according to the Commission, is "fair rate treatment."

UGI says that it is entitled to earn a fair rate of return on its whole investment. The Commission in response points, however, to a principle of utility law that the utility rate base should include only the "value of the utility's property used and useful in rendering its public services." *Pennsylvania Power & Light Co. v. Pennsylvania Public Utility Commission*, 10 Pa. Commonwealth Ct. at 334, 311 A.2d at 155.

It must be kept in mind that the test year utilized in this case was also the first year of the UGI-Amoco venture. There is therefore little history to shed light on the productivity, or lack of the same, of the wells drilled or proposed to be drilled. The Commission reasoned that UGI's right to purchase 27,000 BCF of gas might prove to be substantially all of the gas certain to accrue from the venture. By dividing the 27,000 BCF into UGI's $6.5 million investment, the Commission found that UGI paid $0.24 per million cubic feet (MCF) for the right to purchase this gas. Since 886,000 MCF were obtained by UGI during the test year, the Commission allowed UGI $215,000 (886,000 MCF × $0.24 per MCF = $214,589) as an expense for the price of the gas. Assuming a steady rate of use, UGI will recoup its initial $6.5 million investment in 28 years. These figures are precisely those used by UGI in its own expense figures originally submitted to the Commission. The Commission, as noted, rejected UGI's claim that the $1.2 million dry well costs should be included in rate base.

We agree that this record provides little support for a finding that UGI will realize substantially more than 27,000 BCF, or 886,000 MCF per year from its

joint venture. If the record were otherwise—that is, showed that substantial gas supplies had or would be obtained, UGI's costs whether for producing or dry wells would be includable in rate base, and the Commission concedes as much.

In the area of adjustments to rate base, the Commission has wide discretion. *Duquesne Light Co. v. Pennsylvania Public Utility Commission*, 174 Pa. Superior Ct. 62, 69-70, 99 A.2d 61, 69 (1953). The Commission acted within a sound discretion in allowing UGI to claim the $6.5 million initial payment as an expense and in disallowing the inclusion of $1.2 million dry well costs in rate base, at this time and on this record.

UGI's APPEAL—CASH WORKING CAPITAL ELEMENT OF UGI's RATE BASE

UGI claims the Commission erred in allowing only $1,970,000 instead of its claimed $3,804,000 for cash working capital in its rate base. Cash working capital represents the utility's need for cash to meet current obligations arising out of the rendition of services for which revenues have not yet been received. The need arises because utilities typically pay their obligations on a current basis, whereas revenues come into the utility only after services have been provided. "Cash working capital ordinarily is the amount of cash required to operate a utility during the interim between the rendition of service and the receipt of payment therefor." *Pittsburgh v. Pennsylvania Public Utility Commission*, 370 Pa. 305, 309, 88 A.2d 59, 61 (1952).

UGI claimed cash working capital needs of $3,804,-000 for operation and maintenance expense and $1,-320,000 for compensating bank balances. The Commission allowed only $1,970,000. UGI claims that the Commission committed three errors, the first in the calculation of lag days, the second in determining

UGI's average daily expenses, and the third by deducting an item of accrued interest from the working capital requirement.

## A. Lag Days

UGI contends that the Commission erred by fixing average revenue lag days at 38 instead of 41 days claimed by UGI and by determining average expense lag to be 29 days, instead of 28 lag days asserted by UGI. UGI's claim in this regard was based on its own experiences. The Consumer Advocate produced a witness who testified that the Philadelphia Electric Company has shorter lag periods.

The Commission's only comment on this subject is that "we have utilized the average revenue lag for Residential and Commercial and Industrial Customers recommended by the Consumer Advocate." This casual pronouncement makes review impossible and impels us to remand the record to the Commission for such findings and explanation as are necessary to render the Commission's reasons for its reduction of UGI's claimed average lag days discernible. *Philadelphia Suburban Water Co. v. Pennsylvania Public Utility Commission,* 38 Pa. Commonwealth Ct. 614, 394 A.2d 1063 (1978).

## B. Average Daily Expenses

UGI claims that its average daily expenses are $300,000. The Commission, when calculating UGI's required cash working capital, set UGI's average daily expenses at $293,000. Apparently the Commission, contrary to the recommendations of its staff, deducted $7,000 in alleged non-cash items from UGI's average daily expenses. The Commission's order is devoid of findings on or discussion of this subject. Again, being unable to discern from the Commission's order the reasons for the reduction, and neither brief providing

us any enlightenment, we will remand for findings and explanation.

## C. Interest Offset

UGI contends that the Commission erred in offsetting against its claim for cash working capital an amount of $1,180,000 set aside by UGI to pay interest accrued on long-term debt. UGI, without statement of fact or citation of authority, says that the fund is property of the company, not consumer contributed capital. It also contends without providing reasons that the fund is not properly available for use as cash working capital. The Commission counters that UGI may lawfully use the money for cash working capital or any other purpose. There being no suggestion that the money in question is subject to any legal restraint on its use by the company for any purpose, we conclude that the Commission's position is correct. Authority for our holding is provided by the case of *Pittsburgh v. Pennsylvania Public Utility Commission, supra,* where the Pennsylvania Supreme Court approved a Commission's offset against cash working capital of a fund set aside for accrued taxes.

## UGI's APPEAL—
### TREATMENT OF UNRECOVERED FUEL COSTS

Between July 1, 1974 and September 30, 1975, UGI incurred $4,940,728 in fuel costs which it did not recover under the then existing fuel cost adjustment clause (FCA) because the FCA did not contain an actual fuel cost adjustment factor to remedy the effect of decreased gas sales due to curtailment of supplies in the face of rapidly escalating prices. *See* Act of May 28, 1937, P.L. 1053, §307, *as amended* (formerly found at 66 P.S. §1147), repealed by the Act of July 1, 1978, P.L. 598, §2. UGI proposed rates which would permit it to recover the costs over three years at $1,-

647,576 a year. The Commission disallowed this on the ground that the expenses were non-recurring and too remote from the test year.

UGI claims that these costs are not too far removed from the test year nor barred due to their non-recurrent nature because UGI had sought recovery of these costs in a 1975 tariff proceeding, R.I.D. 264, in which the Commission approved implementation of UGI's tariffs which UGI alleges "were justified in part by its unrecovered fuel costs." The Commission's Order, however, in R.I.D. 264 was silent concerning the resolution of each component comprising UGI's need for tariff adjustments. UGI argues that since the Commission approved its proposed tariffs, which included UGI's unrecovered fuel costs, the Commission's order in that case must be interpreted as having allowed UGI's recovery of these costs. Therefore, the amount of these fuel costs which remained unrecovered as of the present tariff filing must be allowed based upon the law of the case established by the prior order. The Administrative Law Judge, after an extensive review of the evidence, agreed with UGI and recommended allowance of the claim, writing the following:

Commission Prosecutory Staff, in their contention that Respondent's past unrecovered fuel costs may not be considered for the reason that the settlement order at R.I.D. 264 did not specifically address that issue, does not take into consideration that their position regarding rate case expenses in R.I.D. 264 is in direct opposition to their contention in regard to unrecovered fuel costs. In regard to rate case expenses, Mr. Sunchych, testifying on behalf of Prosecutory Staff, testified as follows:

'. . . Furthermore, by respondent's inclusion of the full $201,088 of 1975 rate case expense in the present proceeding, respondent has in effect

failed to amortize the original $145,758 over a three year period from September 29, 1976 as was contemplated in the 1975 rate filing settlement.' (Prepared Testimony of Charles W. Sunchych, page 8)

We are at a loss to understand why Respondent may not assert what the Commission intended by its settlement order, but Commission Prosecutorial Staff is not subject to the same limitation. Regardless of this inconsistency, the position of Commission Prosecutory Staff on this issue merely avoids the uncontroverted fact that the loss was sustained in the amount claimed. Furthermore, the claim was made in a timely manner at R.I.D. 264. For this reason, we are of the opinion that the contention of Prosecutory Staff regarding unrecovered fuel costs in R.I.D. 264 are totally irrelevant to the instant proceedings.

. . . .

We are of the opinion that as a matter of constitutional law a utility is entitled to recover in its rates all legitimate expenses incurred in the rendition of its public utility service. This is especially the case where it has been established that the costs were incurred under a fuel cost adjustment clause that did not enable Respondent to recover the full cost of fuel used in supplying its customers. Respondent, as has been noted above, made a timely claim for these costs in R.I.D. 264, its prior rate proceeding. The making of the claim in that proceeding and the sworn testimony of Mr. Wilcox setting forth how the claim arose appears to have been uncontradicted. The only dispute in R.I.D. 264 regarding the unrecovered fuel cost appears to

have been the period of time over which the claim was to be amortized. Thus, the claim that it is not possible to ascertain on the face of the settlement order at R.I.D. 264 whether the unrecovered fuel costs were recognized is somewhat misleading. In our judgment, while it is not clear what amortization period was recognized in that proceeding, the Commission implicitly recognized the validity of the claim of Respondent for its unrecovered fuel costs.

If the order in R.I.D. 264 included UGI's claim for its unrecovered fuel costs, UGI should now be allowed to recover these costs. The Commission's order includes not one word on the subject which the Administrative Law Judge thus found required that UGI's claim for these admittedly unrecovered costs should be allowed. If the Commission addressed the issue and concluded that these costs had not been allowed or having been allowed, had been recovered, it has not said so. We will remand this issue to the Commission for findings on this subject. We repeat that if these costs were claimed and recognized at R.I.D. 264 and if they have not been recovered, as the Administrative Law Judge concluded, they may not be disallowed here.

UGI's APPEAL—

TREATMENT OF UGI's RATE CASE EXPENSES

UGI claims rate case expenses of $431,476, consisting of $230,388 for the instant proceedings and $201,088 incurred in connection with a prior rate case (R.I.D. 264). UGI proposed to amortize this sum over five years, at $86,275 annually. The Commission allowed only $28,898 of the $86,275 to be included in UGI's annual operating expenses.

The Commission arrived at the $28,898 figure by first deducting from the $201,088 incurred in the ear-

lier case, $60,327 an amount the Commission says was reflected in rates allowed in the earlier case. This leaves $371,149 in total unamortized rate case expenses ($230,388 + ($201,088-$60,327)). The Commission next disallowed 6% of the total unamortized rate case expenses, $22,269, as an amount which the Commission believed should be borne by UGI's stockholders. This further reduced the unamortized rate case expenses to $348,880. Amortization of this amount over five years would be at $69,776 annually. The Commission then deducted from $69,776 annual amortization, $40,878, which amount the Commission says was included in expenses claimed elsewhere in the proceedings. Thus, the final amount allowed yearly for five years on account of rate case expense was $28,898.

UGI claims that the Commission erred in two respects. First, that the Commission's deduction of 6% of UGI's total claimed rate case expenses from UGI's claim as a fair proportion to be borne by UGI's shareholders was unauthorized by law and unjustified in fact. "[T]here is no hard and fast rule which requires the commission to allow the entire rate case expense." *Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission*, 153 Pa. Superior Ct. 475, 499, 34 A.2d 375, 386 (1943). The courts have gone only so far as to hold that ratepayers should pay a utility's rate case expenses when a utility-initiated rate proceeding results in the utility's proposed rates being entirely or substantially upheld. *Peoples Natural Gas Co., id; Solar Electric Co. v. Pennsylvania Public Utility Commission*, 137 Pa. Superior Ct. 325, 381-83, 9 A.2d 447, 476-77 (1939). In the instant case, the 6% deduction only reduces UGI's $86,275 annual expense by $4,454. The Commission did not abuse a sound discretion in disallowing 6% of unamortized rate case expenses.

UGI, without specificity, says the Commission committed mathematical errors in arriving at the allowance of only $28,898 a year for five years. Unfortunately, UGI fails to tell us what the mathematical errors the Commission is supposed to have committed are. It fails to mention the $60,327 figure the Commission says had already been recovered, thus reducing the yearly claim to $69,776, or the $40,878 in amortization booked and allowed as other test year costs. In short, UGI has provided no rebuttal of the Commission's calculations. Failure to deduct these amounts would result in their double inclusion in operating expenses. Therefore, the Commission did not err in allowing only $28,898 of UGI's $86,275 claimed rate case expenses to be included in UGI's annual operating expenses.

UGI's APPEAL—TREATMENT OF TRANSCO SNG PLANT AND WHITE PLAINS STORAGE PROJECT EXPENSES

UGI, seeking to obtain supplemental gas supplies and additional underground storage capability, undertook feasibility studies in consideration of joining in the Transco SNG Plant and the White Plains Storage Project. These studies cost UGI $413,112. In the fall of 1976, UGI voluntarily terminated its participation in these projects before realizing any results therefrom, turning instead to its joint venture with Amoco. In this proceeding, UGI seeks to recover the cost of the feasibility studies over three years, at $139,704 annually. The Commission disallowed UGI's claim for $139,704, on the ground that "there is no reason why ratepayers should assume any cost for projects voluntarily terminated by [UGI] from which ratepayers receive no benefits whatsoever." We disagree.

A public utility is entitled to recover all of its reasonably incurred expenses. The feasibility studies

here in question were a direct and clearly prudent step in providing public service and UGI is entitled to recover their cost.

The Commission's position that only those actions which result in increased gas supplies being provided to UGI's customers may be considered recoverable expenses is untenable. Such a rule would discourage feasibility studies conducive to efficient operations. The question to be asked and answered with regard to this kind of management action is not whether the utility got more gas as the result of the study but whether the study was reasonably calculated to achieve such a result. *Cheltenham & Abington Sewerage Co. v. Public Service Commission*, 122 Pa. Superior Ct. 252, 275, 186 A. 149, 160-61 (1936). The reasonableness of UGI's decision in the latter sense is not questioned.

The Commission raises for the first time the argument that the costs of the feasibility study should be disallowed because they are too remote and non-recurring. UGI terminated its participation in the Transco SNG Plant and White Plains Storage Project approximately six months before the beginning of its test year. We do not believe that UGI should be penalized for ending its participation at that time rather than waiting until the next tariff filing. Further, while these particular feasibility studies will not be undertaken again, other studies will, and no doubt should, be conducted. Thus, although the cost of *these* studies is non-recurring, the cost of other feasibility studies *is* a recurring expense which should be allowed as a proper operating expense.

We therefore reverse the Commission's decision in this regard and hold that UGI should be allowed $413,-112 as an operating expense, amortized as the Commission shall reasonably direct.

UGI's Appeal—Challenge To The Rate of Return
Adopted by The Commission

UGI attacks the Commission's calculation of a
7.57% overall rate of return on fair value based *inter
alia* on a 7.0% return on the cost of equity capital on
two grounds. UGI first claims that the Commission
looked solely to book common equity when calculating
its rate of return, in contravention of our holding in
*Pennsylvania Gas & Water Co. v. Pennsylvania Public
Utility Commission*, 33 Pa. Commonwealth Ct. 143, 381
A.2d 996 (1977). Second, UGI contends that the Com-
mission's rate of return is not based upon record evi-
dence. UGI also contests the Commission's failure to
adjust UGI's rate of return upward to compensate for
the exploration risks attendant in the UGI-Amoco
joint venture.

Although UGI and the Commission provide a mul-
titude of calculations supporting their respective po-
sitions, we deem it unnecessary to burden this opinion
with similar considerations. The issues raised by UGI
may be dealt with more simply.

UGI first argues from the following dictum ap-
pearing in *Pennsylvania Gas & Water Co. v. Pennsyl-
vania Public Utility Commission, supra.*

> Finally, we note that the PUC attempted to jus-
> tify its overall decision on the ground that it
> permitted a 17.28 percent return on 'original
> cost common equity invested solely in water op-
> erations (excluding acquisition adjustment of
> $14,600,000).' Although we are uncertain of the
> meaning of this phrase and its role in rate pro-
> ceedings, we are certain that 'original cost com-
> mon equity' is not a proper measure of the rea-
> sonableness of rates insofar as it employs exclu-
> sively an original cost measure of value. The
> standard of a 'fair return on the fair value of

property used and useful in the service of the public,' remains as the ultimate standard governing rate-making in this Commonwealth. (Footnote omitted.)

33 Pa. Commonwealth Ct. at 159, 381 A.2d at 1004.

While we adhere to our belief that book common equity (original cost common equity) should not be the sole determinant of this element of rate of return, we observe that the Commission here considered factors in addition to book common equity. The Commission's Order shows consideration of the market performance of UGI stock, the cost of issuance and market pressures, and the amount of incentive premium necessary to attract investors to purchase UGI's equity. The Commission recognized that its duty was to find "that rate which will permit respondent [UGI] to attract equity capital at a reasonable cost and provide a fair return on capital employed in its gas division."

UGI's reliance upon *U.S. Steel Corp. v. Pennsylvania Public Utility Commission, supra,* to support its view that the Commission's rate of return is not supported by the evidence of record is misplaced. In that case, the only rate of return evidence was presented by the utility. The Commission nevertheless allowed a rate of return different from that proposed by the utility without reference to any evidence in the record to support its conclusion. In the instant proceedings, the Commission had rate of return testimony and evidence presented to it not only by UGI but also by OCA and the Commission Prosecutory Staff. For example, the Commission chose to accept the Staff's expert's use of market performance for 1977 through February 1978, rather than the "barometer group" data, which lacked 1978 figures, presented by UGI's expert. *See Pittsburgh v. Pennsylvania Public Utility Commission,* 182 Pa. Superior Ct. 376, 384, 126 A.2d 777, 781

(1956). The Commission in this area requiring technical expertise acted within its discretion and its findings and conclusions are supported by substantial evidence and we will not disturb them.

Finally, UGI contends that the Commission should have adjusted the rate of return upward by 0.5% to reflect the risks inherent in UGI's joint venture with Amoco. We believe that the Commission, after examining the market test evidence presented, not improperly concluded that

> [w]hether primary weight is given the experience of a group of barometer companies or that of Respondent, investors have realized the potential risks involved in gas exploration and have evaluated them in making capital available. Thus, the risk potential associated with Respondent's gas exploration, in our opinion, has been duly considered by investors in the market.

Accordingly, we affirm the Commission's adoption of an overall rate of return of 7.57% based *inter alia* upon a cost of common equity return of 7.00%.

UGI'S APPEAL—COMMISSION'S ORDER TO UGI CONCERNING STRUCTURE OF UGI'S TARIFF SCHEDULE

UGI also complains about the Commission's direction that it "so structure its tariff revisions so that it shall in no event receive expenses that are amortized over a fixed time period in excess of the amount of expenses actually incurred." UGI says that this paragraph is impermissibly vague and that it is a future rate adjustment and a violation of 66 Pa. C.S. §1309, which provides in part that the Commission may adjust rates only after notice and hearing. This argument displays more pique than substance.

UGI's argument that the Commission's language is too vague and indefinite for UGI is clearly without

merit. The language "structure its tariff" clearly refers to the Commission's requirement, set forth in the immediately preceding paragraph, that UGI "file . . . tariff revisions containing acceptable rates." UGI's complaint that it does not understand what the word expenses refers to is equally without merit. The Commission has carefully delineated the scope of its use of the word expenses as those actually incurred.

We do not agree that the Commission is attempting to engage in unlawful future rate-making. Common sense dictates that UGI receive no more from its customers than is required to amortize expenses actually incurred by UGI. We do not understand that the Commission has ordered a change in rates based on the future level of costs. Its order merely recognizes the fact that a yearly amortization figure for certain expenses is included in UGI's rate base and that UGI's rates designed to recover such should not be continued beyond the time allowed.

The Office of Consumer Advocate has also appealed. It presents four questions for our consideration. The first is a complaint as to the failure of the Commission (and of the Administrative Law Judge) to make findings on and discuss three of the numerous issues it raised in opposition to UGI's claim for additional revenues. The three remaining issues addressed are those which the Commission neglected expressly to expound upon. None involves significant amounts of money.

OCA's Appeal—Contention That The Commission Failed To Make Sufficient Findings of Fact

OCA contends that the Commission completely ignored the three issues raised by OCA in this appeal despite OCA's presentation of evidence on these issues. OCA claims the Commission's failure to make specific findings of fact and conclusions regarding

these issues violates statutory law, 66 Pa. C.S. §§703 (e), 1308(d), and case law, *Begis v. Industrial Board of Department of Labor & Industry*, 9 Pa. Commonwealth Ct. 558, 308 A.2d 643 (1973). We disagree.

If OCA prevailed in full on all of the three issues UGI's operating expenses would be reduced by only $292,000 in this case with twelve contested issues involving millions of dollars. With respect to these issues we are mindful of Judge MENCER's words in *Application of Midwestern Fidelity Corp.*, 26 Pa. Commonwealth Ct. 211, 230 n. 6, 363 A.2d 892, 902 n. 6 (1976):

> Again, we note that appellant's objections to a lack of exhaustive findings of fact have no merit. The courts of this Commonwealth have never held that an administrative agency must set forth findings specifically noting the rejection, and reasons for such rejection, of each and every minor allegation of a party. A voluminous record does not create, by its bulk alone, a multitude of real issues demanding individual attention. . . .

Further, on each of the points the Commission was faced simply with a choice of actions, each fully explained in the record and the Commission's choice in each case amounted to an implicit acceptance of the thesis of the party which prevailed and a rejection of the contentions of the loser.

## OCA's Appeal—Amoco Joint Venture Costs

It will be recalled that the Commission allowed the sum of $215,000 a year for 28 years to amortize the approximate $6.5 million dollars of initial expenses incurred by UGI in the Amoco venture and that included in the $6.5 million was approximately $1.2 million of costs of dry holes. It will also be recalled that the Commission refused to include in rate base any of the

dry hole costs as UGI says it should. UGI did not claim nor did the Commission allow any costs associated with successful wells as part of the rate base.

OCA contends that it was improper of the Commission to permit Amoco to expense any dry hole costs. This contention is obviously without merit. First, it is based on an assertion that no benefits of the venture had begun to flow to the customers; on the contrary UGI obtained the right to purchase 27,000 BCF of gas upon entering the venture and had received 886,000 MCF during the test year. OCA's further contention that since UGI continued to accrue Allowance For Funds Used During Construction (AFUDC) on successful costs, it was assured not only of recovering its entire investment as an expense but also of getting a return on its investment in successful wells. The fallacy in the argument lies in the fact that the Commission allowed no return on either successful wells or on AFUDC associated with successful wells in this case; nor did it guarantee to recognize these items in rate base in future UGI rate cases.

## OCA's Appeal—UGI's Allocation of Capital Stock Tax Expense

OCA contends the Commission should not have accepted UGI's allocation of its capital stock tax expenses between its gas and electric division. UGI utilized the Wisconsin Formula, a composite allocation formula which adds plant investment, operating revenues, and operating expenses for each division to determine the allocation factor for common expenses. OCA would have the Commission instead use the net plant ratio method of allocation, by which capital stock tax expense is allocated between the gas and electric divisions according to the net plant investment of each. This, OCA says, would allocate 75.9% of capital stock tax to the gas division instead of the 80% allo-

cated to the gas division under the Wisconsin Formula. OCA's method would result in only a $14,600 decrease, in the amount of capital tax expense allocated to the gas division.

We agree with the Commission's acceptance of UGI's use of the Wisconsin Formula. Just as the value of the company's capital stock for capital stock tax purposes includes consideration of many factors other than plant investment, so the allocation of the expense of that tax should include many factors other than net plant investment. In any case, the method of allocation of this minor item seems to us to be one purely of judgment. Since the record supports the Commission's action, we should not substitute our view of the matter, even if it differed from the Commission's. *Pennsylvania Public Utility Commission v. Department of Transportation*, 21 Pa. Commonwealth Ct. 415, 419-20, 346 A.2d 376, 378-79 (1975).

OCA's APPEAL—CONSIDERATION OF INCOME TAX EFFECT OF INTEREST ON UGI's SHORT-TERM DEBT

OCA challenges the Commission's failure to consider the income tax effect of interest on UGI's short-term debt. OCA contends that $134,000 of tax deductible interest expense on short-term loans should be removed from UGI's claimed tax expense. The Commission's brief says that the adjustment proposed by OCA is unnecessary because short-term debt is used to finance Construction Work in Progress (CWIP), which is not included in UGI's rate base. Instead of a return upon the CWIP, the utility may accrue an Allowance For Funds Used During Construction (AFUDC), which is reduced by the tax effect of interest on the short-term CWIP debt. When the CWIP is completed and included in the utility's rate base, the AFUDC also becomes a part of the rate base. Therefore, the Commission reasons, reducing the AFUDC

by the tax effect of interest expenses on short-term CWIP debt is for rate-making purposes comparable to directly reducing the utility's rate base, the only difference being that the savings to the utility's customers is deferred until the CWIP is actually used and useful in rendering public service.

The Commission has, by reducing UGI's accrued AFUDC by the tax savings realized in its interest expenses on short-term CWIP debt, given effective recognition to these tax considerations. OCA's own expert stated that, "given what the company has done, it would appear that the effective AFUDC rate is more like an after tax rate than a pre-tax rate." We see no abuse of discretion in the Commission's decision to credit these tax savings against UGI's accrued AFUDC rather than prematurely recognize these tax considerations in the instant proceedings.

Finally, we have not overlooked UGI's contention that this is a case in which this court should make independent findings of fact and conclusions of law and an order granting the company its requested increases of annual revenues. We would be most reluctant to take such action in any case; as our opinion foregoing would seem to demonstrate, the Commission has not here so neglected its duty as to require so drastic an action so foreign to our usual duty.

We enter the following:

ORDER

AND Now, this 25th day of January, 1980, the order of the Commission with respect to the Lag Days and Average Daily Expenses elements of cash working capital is reversed and the record remanded for findings and further disposition of these elements and for a new calculation of allowed cash working capital, if indicated; the Commission's order with respect to the item of $4,940,728 in unrecovered fuel costs claimed by

UGI is reversed and the record remanded for further action consistent with our opinion on that subject; the Commission's order with respect to the $413,112 cost of UGI's feasibility studies of the Transco SNG Plant and the White Plains Storage Project is reversed with direction to the Commission in a new order to allow this item as an operating expense amortized as the Commission shall reasonably direct; and the Commission's order adopted August 24, 1978 and entered November 3, 1978 is in all other respects affirmed.

This decision was reached prior to the expiration of the term of office of Judge DiSalle.