186

Pennsylvania Electric Company, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued February 6, 1980, before President Judge BOWMAN and Judges CRUMLISH, JR., WILKINSON, JR., MENCER, BLATT, CRAIG and MACPHAIL. Judges ROGERS and WILLIAMS, JR. did not participate.

*Samuel B. Russell*, with him *W. Edwin Ogden, Ryan, Russell & McConaghy*, for petitioner.

*Gregg C. Sayre*, Assistant Counsel, with him *Steven A. McClaren*, Deputy Chief Counsel and *George M. Kashi*, Chief Counsel, for respondent.

*Craig R. Burgraff*, Assistant Consumer Advocate, for Office of Consumer Advocate.

OPINION BY JUDGE CRUMLISH, JR., July 23, 1980:

Pennsylvania Electric Company (Penelec) has filed a petition for review of a final rate order entered by the Public Utility Commission (PUC). We affirm.

On April 28, 1978, Penelec filed a tariff with the PUC which provided for a general increase in its retail electric base rates based upon data projected for a "future test year"[1] to end December 31, 1978. By order of May 23, 1978, the PUC instituted an investigation into the fairness and reasonableness of the proposed tariff and conducted evidentiary hearings in which the Office of the Consumer Advocate (Consumer Advocate), the PUC prosecutory Staff, and Penelec participated. The PUC, by final order entered January 26, 1979, denied a portion of the increase Penelec sought.

Penelec raises three issues for our review:[2] (1) whether the PUC erred in excluding from rate base a

---

[1] *See* Section 315(e) of the Public Utility Code, 66 Pa. C.S. §315(e); 52 Pa. Code §3.271.

[2] Our scope of review in PUC cases is limited to a determination of whether constitutional rights have been violated, an error of law committed, or its findings and conclusions are unsupported in the record by substantial evidence. *York Water Co. v. Pennsylvania Public Utility Commission*, 51 Pa. Commonwealth Ct. 61, 66 n. 7, 414 A.2d 138, 141 n. 7.

full year's accumulated deferred income tax associated with liberalized depreciation; (2) whether the PUC erred in excluding from rate base the unamortized balances of certain expenses; and (3) whether the PUC erred in reducing the rate base claim for cash working capital by an amount equal to a portion of accrued but unpaid interest on long term debt and dividends on preferred stock. We hold that the PUC did not commit reversible error in deciding these issues.

Penelec's first attack upon the PUC's order focuses on the ratemaking treatment accorded accumulated deferred Federal income taxes associated with liberalized depreciation deductions on its 25% undivided ownership interest in Unit 2 of the Three Mile Island nuclear generation station (TMI-2).[3] With important exceptions not here applicable, I.R.C. §167(1) provides that post-1969 public utility property may be depreciated at a liberalized rate only if the taxpayer uses a "normalization" method of accounting. I.R.C. §167(1)(3)(G) defines the accounting method:

(G) NORMALIZATION METHOD OF AC-COUNTING — In order to use a normalization method of accounting with respect to any public utility property —

(i) the taxpayer must use the same method of depreciation to compute both its tax expense

---

[3] TMI-2 was incapacitated in an incident which occurred on March 28, 1979. The PUC subsequently removed TMI-2 from Penelec's rate base by order entered June 19, 1979, and thus effectively nullified the impact of accumulated deferred income taxes associated with that item of plant. The Consumer Advocate suggests that this subsequent PUC action moots the issue raised by Penelec. Since there has been no suggestion from any party that the issue is mooted as to the time that elapsed between the entry of the PUC's order of January 26, 1979, from which Penelec here appeals, and the PUC's subsequent action following the TMI-2 incident, we proceed to a decision on the merits of the issue.

and its depreciation expense for purposes of establishing its cost of service for ratemaking purposes and for reflecting operating results in its regulated books of account, and

(ii) if, to compute its allowance for depreciation under this section, it uses a method of depreciation other than the method it used for the purposes described in clause (i), the taxpayer must make adjustments to a reserve to reflect the deferral of taxes resulting from the use of such different methods of depreciation.

It is uncontested that the PUC complied with this general definition of normalization in its treatment of Penelec's liberalized depreciation deductions: pursuant to subsection (G)(i), it allowed Penelec to compute, for ratemaking purposes, both its tax expense and its depreciation expense according to deductions available under a straight line method of depreciation; and, pursuant to subsection (G)(ii), it permitted Penelec to compute its allowance for depreciation under Section 167(1) (and thus its actual tax expense) by using a liberalized rate and by making offsetting adjustments to a reserve for the deferred taxes which resulted from the use of such a liberalized rate. The balance in this accumulated deferred tax account was then, in accordance with standard ratemaking principles[4] recognized by Treas. Reg. 1.167(1)-1(h)(6), T.D. 7315, 39 F.R. 20195a (1974), deducted from rate base. Penelec complains, however, that in following this procedure the PUC deducted from rate base an amount greater than the applicable treasury regulations allow, and has thus (1) jeopardized Penelec's right under Federal law to claim liberalized depreciation, and (2) confiscated

---

[4] See 1 A. Priest, Principles of Public Utility Regulation 133; Dahl, *The California Remand Case: Controversy over Normalization,* Pub. Util. Fort., Dec. 20, 1979 at 13.

Penelec's property in violation of its right to earn a fair return on fair value.

Penelec claimed, and the PUC allowed, a $4,286,000 deferred income tax expense associated with its ownership of TMI-2, but argued that only $2,056,000 of that amount could be deducted from rate base under Treas. Reg. 1.167(1)-1(h)(6) and example 3 thereunder.[5] The PUC, relying on a different interpretation of that regulation and example, deducted an additional $2,230,000 from rate base to bring the total rate base exclusion into conformity with the claimed tax expense of $4,286,000.

Subdivision (i) of Treas. Reg. 1.167(1)-1(h)(6) provides generally that a taxpayer fails to use a normalization method of accounting if the amount of accumulated reserve for deferred taxes deducted from rate base exceeds the amount of the deferred income tax taken as an expense for ratemaking purposes. It is clear from the facts alleged here that the PUC deducted from rate base only an amount of deferred taxes equal to, not in excess of, the amount of deferred

---

[5] Example 3 provides, in pertinent part, as follows:

Assume the same facts as in example (1) [Corporation X is exclusively engaged in the transportation of gas by pipeline subject to the jurisdiction of the Z Power Commission. With respect to its post-1969 public utility property, X is entitled under Section 167(1)(2)(B) to use a method of depreciation other than a subsection (1) method if it uses a normalization method of regulated accounting.] except that for purposes of establishing cost of service the Z Power Commission uses a future test year (1975). The rates are contemplated to be in effect for 1975, 1976, and 1977. Assume further that plant additions, depreciation expense, and taxes are projected to the end of 1975 and that the reserve for deferred taxes under section 167(1) is $1,300,000 for 1974 and is projected to be $4,400,000 at the end of 1975. *Assume also that the Z Power Commission applies the rate of return to X's 1974 rate base* of $145,000,000. (Emphasis added.)

taxes taken as an expense for ratemaking purposes. Under this first test, then, the PUC has allowed Penelec to use a normalization method of accounting.

Subdivision (ii) of Treas. Reg. 1.167(1)-1(h)(6), which poses somewhat more of an interpretative problem because of its attempt to anticipate state regulatory commission ratemaking methods, provides in part as follows:

> For the purpose of determining the maximum amount of the reserve to be excluded from the rate base ... under subdivision (i) of this subparagraph, if solely an historical period is used to determine depreciation for Federal income tax expense for ratemaking purposes, then the amount of the reserve account for the period is the amount of the reserve ... at the end of the historical period. *If solely a future period is used for such determination, the amount of the reserve account for the period is the amount of the reserve at the beginning of the period and a pro rata portion of the amount of any projected increase to be credited or decrease to be charged to the account during such period.* If such determination is made by reference both to an historical portion and to a future portion of a period, the amount of the reserve account for the period is the amount of the reserve at the end of the historical portion of the period and a pro rata portion of the amount of any projected increase to be credited or decrease to be charged to the account during the future portion of the period. (Emphasis added.)

Though the intent of the regulation is to effect clear distinctions among determinations of depreciation for Federal income tax expense for ratemaking purposes based on historic test years, future test years,

and test years involving both historic and projected data, a comparison of the PUC's actual future test year experience in this case with the hypothetical factual situation provided in the regulations to illustrate a future test year situation[6] indicates a significant difference between the PUC's treatment of test year rate base and the treatment assumed in the example. In this case, the PUC calculated rate base at the end of the future test year to include the full fair value of TMI-2 as if the property had been in operation for the full year. The example in the regulations, on the other hand, calls for the assumption that the regulatory commission will exclude from a *historically* determined rate base projected increases in the reserve for deferred taxes. That assumption, applied to Penelec's rate case before the PUC, would have resulted in the total exclusion of the fair value of TMI-2 from rate base. Since just the opposite has actually occurred here, however, we deem Penelec's reliance on the future test year example in the regulation to be misplaced. The PUC included the full value of the property subject to the claimed accelerated depreciation in the future test year rate base, allowed a full year's deferred income tax expenses associated with that property, and, in compliance with subdivision (i) of Treas. Reg. 1.167(1)-1(h)(6), excluded a full year's accumulated deferred taxes, not exceeding the allowed tax expense, from rate base. As we read I.R.C. §167(1)(3)(G) and Treas. Reg. 1.167(1)-1(h)(6), this treatment constituted the use of a "normalized" method of accounting. For similar reasons, we conclude that the PUC's ratemaking treatment of deferred Federal income taxes did not constitute a confiscation of Penelec's property.

Penelec's second attack alleges that the PUC erred in excluding from rate base the unamortized balances

---

[6] *See supra* note 5.

of rate case expense, flood expense, and deferred energy costs. By the terms of the PUC's order, each of these expense items is being amortized over a certain period of time, and a portion of each is thus recovered each year as an operating expense. At issue is whether the PUC must, in addition to allowing the amortized portions as expenses, include in rate base that portion of each expense that has not yet been recovered. We faced a similar question recently in *UGI Corp. v. Pennsylvania Public Utility Commission*, 49 Pa. Commonwealth Ct. 69, 77, 410 A.2d 923, 928 (1980), wherein we observed that a utility could not "capitalize an item in its rate base and at the same time recover the item as an expense from ratepayers." In *UGI* the utility attempted to amortize the expense of its gas exploration program over a period of 28 years and to include in rate base a portion of that expense which represented net unsuccessful well costs. The PUC excluded the rate base claim and we affirmed. We find our reasoning there to be equally applicable here, especially since all of the items claimed here by Penelec — rate case expense, flood expense, and deferred energy costs — are clearly retrospective in nature, and are thus comparable to UGI's unsuccessful gas exploration costs, which were at that time associated with a fledgling venture guaranteeing only a fixed predetermined gas supply.

Penelec's third and final attack on the PUC's order raises the propriety of reducing the cash working capital claim in rate base to reflect accrued but unpaid interest on long term debt and dividends on preferred stock. Turning first to the PUC's exclusion to reflect accruals for payments on long term debt, we note that we have twice in recent rate case appeals approved an identical procedure, *Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission*, 52 Pa. Commonwealth Ct. 201, 205-6, 415 A.2d 937, 939 (1980);

*UGI, supra* at 81, 410 A.2d at 930, and we thus affirm the PUC's decision without further discussion. As to the exclusion to reflect accruals for dividends on preferred stock, the reasons supporting the exclusion from working capital of long term debt interest accruals apply with equal force. "There being no suggestion that the money in question is subject to any legal restraint on its use by the company for any purpose, we conclude that the [PUC's] position is correct." *UGI, supra* at 81, 410 A.2d at 930.

Accordingly, we

### ORDER

Now, July 23, 1980, the final order of the Pennsylvania Public Utility Commission at Docket No. R-78040599 adopted January 11, 1979, and entered January 26, 1979, is hereby affirmed.

President Judge BOWMAN did not participate in the decision in this case.