Philadelphia Electric Company, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

David M. Barasch, Acting Consumer Advocate, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued May 8, 1985, before President Judge Crum-LISH, JR., and Judges Rogers, Craig, MacPhail, Doyle, Barry and Palladino.

412

David B. MacGregor, with him, Walter R. Hall, II, Michael G. Nearing, Jack E. Jerrett and Michael A. McGrail, Morgan, Lewis & Brockius, Of Counsel: Edward G. Bauer, Jr., Vice President and General Counsel, and Irene A. McKenna, Assistant Counsel, for petitioner/intervenor, Philadelphia Electric Company.

Irwin A. Popowsky, with him, David Wersan, Assistant Consumer Advocate, David M. Barasch, Consumer Advocate and Susan L. Rockwell, Edward J. Riehl and Herbert Smolen, for petitioner/intervenor, David M. Barasch, Consumer Advocate.

Veronica A. Smith, Assistant Counsel, with her, Marlane R. Chestnut, Assistant Counsel, Albert W. Johnson, III, Deputy Chief Counsel, and Charles F. Hoffman, Chief Counsel, for respondent.

OPINION BY JUDGE ROGERS, December 11, 1985:

We are asked to review an order of the Pennsylvania Public Utility Commission (Commission) entered November 23, 1983; docketed to No. R-822291 on the docket of the Commission; and disposing of the matter of the Philadelphia Electric Company's (PECO) Supplement No. 40 to Tariff Electric-Pa.

P.U.C. No. 25 which supplement proposed rates designed to increase PECO's annual operating revenues by $228,233,000 based upon a future test year ended October 31, 1983. The Commission here determined, following investigation and hearing and on the basis of a Recommended Decision of an Administrative Law Judge (ALJ), that the proposed rates were unjust and unreasonable and instead permitted PECO to file a tariff or tariff supplement designed to produce an increase in annual operating revenues of $143,518,000.[1] PECO has filed a Petition for Review to No. 44 C.D. 1984. The Office of Consumer Advocate (OCA) has appealed to No. 3561 C.D. 1983.

Four issues are presented by PECO's Petition for Review.

A. Was it not error and confiscation of PECO's property for the Commission to disallow recovery of reasonable and prudent operating, maintenance and depreciation expenses which were deferred pursuant to a Commission Declaratory Order for adjudication in this proceeding?

B. Was it not error and confiscation of PECO's property to reduce net negative salvage expense by taking from PECO and awarding to ratepayers a portion of PECO recovery of its investment in assets dedicated to public service?

C. Was it not error and confiscation of PECO's property to reduce PECO's cash working capital allowance to reflect accrued bond interest where the record establishes that accrued bond interest is not a source of cash working capital for this utility?

---

[1] The ALJ recommended a revenue increase of $156,700,000.

D. Was it not error and confiscation of PECO's property to reduce PECO's claimed utility plant in service on account of an alleged overestimation of test year end plant balances, where there is no record evidence to support such an adjustment?

Three issues are presented by the OCA's Petition for Review.

A. Was it not error to charge current ratepayers a return on investment in nuclear fuel which would not be used to provide actual service during the applicable test year?

B. Was it not error to charge current ratepayers a return on investment in land which would not be used to provide actual service during the applicable test year?

C. Was it not error to permit the inclusion in the rate base of transmission facility construction work in progress?

### A. PECO's Appeal—Deferred Maintenance and Depreciation Expenses

As indicated, PECO first challenges the Commission's disallowance of $41,400,000 representing operating and depreciation expense waived by the utility during the period between December 31, 1982 and November 23, 1983 in the operation of certain pollution control equipment[2] required by consent decree in litigation commenced by the United States Environmental Protection Agency and the Commonwealth Department of Environmental Resources to be installed in conjunction with PECO's Eddystone and Cromby

---

[2] Stack gas emission scrubbers, magnesium oxide regeneration facilities (including scrubber product drying and storage facilities, off-site regeneration plants, and new and expanded waste water treatment facilities), upgraded particulate collection systems, and stack monitoring instruments.

coal-fired electric generators. The capital cost of this pollution control equipment was approximately $285,000,000. It is undisputed that installation of this equipment permitted PECO to continue operating the coal-fired generators identified with concomitant cost advantages to the utility and its customers.

On December 21, 1982, at about the time the pollution control equipment first became operational, PECO presented to the Commission a Petition for Declaratory Order in which the utility prayed for the issuance of an order approving PECO's proposed deferred accounting of the approximately $3,500,000 per month in operating and depreciation expenses associated with the pollution control facilities. In support of this prayer, PECO averred that the pollution control facilities would be completed and in service prior to December 31, 1982; that the pollution control facilities were solely of benefit to the utility's customers in permitting the use of fuel of low cost high sulfur coal mined in the Commonwealth; that "the operation of these new facilities will impose significant additional cost upon PECO, which costs will not be recovered by current rate levels"; that the utility's estimate of its 1983 year end mortgage indenture coverage ratio in the absence of the relief requested in the Petition for Declaratory Order was 1.92 which estimated ratio would "adversely impact [PECO's] ability to raise capital required to finance its construction program"; and that approval of PECO's method of deferred accounting would result in an interest coverage ratio adequate for this purpose.

The OCA interposed a response to the utility's Petitions contending, *inter alia,* that it was altogether unclear whether PECO was seeking the Commission's determination that the costs associated with the control equipment are recoverable from the ratepayers

or was merely seeking Commission approval of a deferred accounting mechanism to be employed by the utility until such later time as the substantive issue of cost recovery could be decided in the context of PECO's pending general rate increase request. If an accounting method approval were at issue, the OCA argued, no such approval from the Commission was required or appropriate. If the utility was seeking a determination of the recoverability of specified costs then it was the OCA's position that such substantive rate relief could not be granted outside the statutory rate increase request proceeding.

In its reply to OCA's responsive pleading, PECO made clear that it merely sought approval of an accounting method and that it was not seeking a determination from the Commission that the pollution control costs were recoverable from the ratepayers; the utility's prayer follows:

Wherefore, [PECO] respectfully requests . . . that the Commission issue a Declaratory Order approving deferred accounting for operation, maintenance and depreciation expense associated with pollution-control facilities recently completed for the Eddystone and Cromby generating stations and containing a statement that the justness and reasonableness of the amortization of such costs will be adjudicated as an issue in [PECO's] next rate proceeding.

The necessity of this relief, in the utility's view is described in this reply as follows:

Under applicable accounting principles and standards to which [PECO's] certified public accountants must conform, unilateral action by [PECO] to defer these costs and request their future recovery does not permit a determination [by the accountants] that there is prospect

of cost recovery . . . [PECO] *has been specifically informed by its Auditors that unless the requested Declaratory Order is obtained, [PECO's] certified financial statements must be conditioned by a footnote if such deferral occurs as the result of unilateral [PECO] action.* Such footnote will fully explain the $48 million reduction in pre-tax earnings which will result should the deferred accounting procedure not be approved. (Emphasis in the original.)

By Order adopted February 18, 1983 and entered March 18, 1983, the Commission granted the prayer of PECO's Petition for Declaratory Order with the following express limitation on the scope of the matters thereby decided:

We therefore will state that approval of PECO's petition cannot and should not be construed as constituting resolution of any substantive issue; rather, that we only are permitting the company to position itself so as to be able to make a clear claim for recovery of the costs separately accounted for. In order to ensure that [PECO's] shareholders understand that the Commission is providing no assurances that the deferred account will be recoverable, and as a condition of our approval of PECO's request to use deferral accounting, [PECO] is required to place the following language as a footnote to all public financial statements which report on periods subsequent to the commencement of operations at the pollution control facilities.

The Pennsylvania Public Utility Commission has authorized deferred accounting for the operation, maintenance and depreciation expenses associated with the pollution control facilities at the Eddystone and Cromby generating sta-

tions, . . . However, the Commission has not ruled that these deferred expenses are recoverable from ratepayers. This decision will be rendered in the next rate case in which the company seeks such recovery. If ultimately denied, current pre-tax earnings would be reduced by [dollar amount to be inserted in the quarter reported].

In its proposed Tariff Supplement No. 40, the utility claimed $14,200,000[3] representing the annual portion of the deferred pollution control facilities' operating, maintenance, and depreciation expense amortized over a three year period. The Commission denied this claim, reasoning as follows:

It is necessary to reiterate that the Declaratory Order (entered March 18, 1983) made no resolution, and imported no implicit approval, of any *substantive* issues raised by way of [PECO's] Petition. Moreover, the Declaratory Order contained no disposition, either inferred or implied, of the propriety of recovery or the appropriateness of any amortization period for any expense which might *subsequently* be determined to be allowable by the Commission.

. . . .

Both Trial Staff and the OCA urge the Commission to reject [PECO's] claim. Noting that actual, total recovery of particular expenses incurred by a utility is not, and never has been, a regulatory objective, Trial Staff cautions that favorable treatment of [PECO's] claim would open 'the Pandora's Box of retroactive ratemaking'. Trial Staff further asserts that

---

[3] The total of deferred expenses sought to be amortized was $41,447,000.

[PECO] has not advanced any reason justifying any extraordinary treatment of the expense. Finally, Trial Staff characterizes [PECO's] claim as retroactive ratemaking in that the expenses which PECO seeks to recover will be completely incurred by the time our decision herein is rendered.

The OCA seeks total disallowance of this claim as 'a complete violation of regulatory principle,' in recognition of the prospective nature of the ratemaking process. Further, the OCA contends that [PECO] has, in essence, 'gone back in time to choose one occurrence out of many that have happened between rate cases.'

. . . .

[After discussing the ALJ's decision to permit the amortized expense recovery and the Commission's determination that this decision was in error], it is axiomatic that ratemaking is prospective in nature. While there have been instances where the Commission has recognized unusual or extraordinary recorded expenses, [PECO] herein has failed to establish to our satisfaction that such treatment is warranted.

. . . .

Simply stated, we are not convinced that PECO has carried its burden of proving the justness, reasonableness or propriety of its claim. (Emphasis in the original. Footnotes omitted.)

The utility here contends that it is entitled to recover by means of customer charges all of its reasonable expenses; that the expenses associated with the Eddystone and Cromby generating plant pollution

control facilities are indisputedly reasonable and have been incurred, at least in part, in order to more sufficiently serve the ratepayers; and, therefore, that the Commission's denial of this claim is in error.

This straightforward syllogism embodies a fundamental flaw. While it is a correct statement of abstract regulatory policy that utilities are entitled to recover operational and other expenses reasonably incurred in providing the public service, the means by which this entitlement has been translated into concrete regulatory practice includes the uniform use in this Commonwealth of normalized expenses projected by the utility with reference to a "test year" which is, at the time of the rate setting proceeding, both future and hypothetical. Thus, the pollution control facilities' expenses here at issue were incurred by PECO during a period which constituted a portion of the "test year" concerning which the utility had adduced evidence of its projected expenses in support of its rate increase request next previous to that here subject to review.

Simply put, these pollution control facilities' expenses were not, for whatever reason, anticipated by the utility nor made the subject of evidence before the Commission in this previous rate case and the question presented by PECO's claim for deferred expenses in the instant proceeding is whether a utility may properly found a claim for increased *prospective* rates on past expense items which were greater than anticipated by the utility's proofs supporting the customer charges in effect.

We addressed this issue in the context of an appeal from the Commission's order of refund in the case reported as *National Fuel Gas Distribution Corporation v. Pennsylvania Public Utility Commission*, 76 Pa. Commonwealth Ct. 102, 464 A.2d 546 (1983).

We there held that the Commission is without the power[4] to order a regulated utility to refund to its ratepayers a particular item of revenue in excess of that anticipated at the time of rate approval unless the utility's rates, considered as to the whole of their effect on the utility's revenues, are unreasonable or unjust. A portion of the explanation for this result follows:

> The Legislature's failure to authorize refunds in case an item of the utility's revenue is greater than anticipated at the time of tariff approval or an item of expense is . . . less than anticipated or approved, is sensible and equitable. It is equitable because the utility may not receive retroactive rate relief on account of expense items which are greater than anticipated or of revenue items which are lesser. It is sensible because consideration of expense items in isolation and the requirement of refunds based only on such narrow consideration could result in the setting of confiscatory rates.

*Id.* at 147, 464 A.2d at 567. To the same effect, we recently held in *Pike County Light & Power Company v. Pennsylvania Public Utility Commission,* 87 Pa. Commonwealth Ct. 451, 487 A.2d 118 (1985):

> The Commission clearly may not establish rates which are calculated to retroactively recover surpluses or refund deficits created by inaccuracies in its prior rate authorizations, However, it may take into account extraordinary losses or gains occurring in the past by amortizing them over a period of years. (Citations omitted.)

*Id.* at 456, 487 A.2d at 121.

---

[4] Pursuant to Section 1312 of the Public Utility Code, 66 Pa. C. S. §1312.

In our judgment, the Commission has here correctly applied these basic regulatory tenets. The general rule is that there may be no line by line examination of the relative success or failure of the utility to have accurately projected its particular items of expense or revenue and an excess over the projection of an isolated item of revenue or expense may not be, without more, the subject of the Commission's order of refund or recovery, respectively, on the occasion of the utility's subsequent rate increase requests.

An exception to this rule in the case of retroactive recovery of unanticipated expenses has been recognized where the expenses are extraordinary and non-recurring. *See Blue Mountain Consolidated Water Company v. Pennsylvania Public Utility Commission,* 57 Pa. Commonwealth Ct. 363, 426 A.2d 724 (1981); *UGI, Corp. v. Pennsylvania Public Utility Commission,* 49 Pa. Commonwealth Ct. 69, 410 A.2d 923 (1980). *See also, Pennsylvania Public Utility Commision v. The Bell Telephone Co. of Pa.,* Docket No. R-80061235 (April 24, 1981) (storm damages and costs of implementing new tariffs); *Pennsylvania Public Utility Commission v. PECO-Gas Division,* 33 Pub. Util. Rep. 4th 319 (1980) (cost of installing leased computer); *Pennsylvania Public Utility Commission v. Pennsylvania Gas and Water Co.,* 24 Pub. Util. Rep. 4th 525 (1978) (storm drainage expense); *Pennsylvania Public Utility Commission v. Duquesne Light Co.,* 16 Pub. Util. Rep. 4th 36 (1976) (employee replacement and training costs for startup of new generating unit). We agree with the Commission that the pollution control facilities' expenses here at issue are clearly neither extraordinary nor nonrecurring. Indeed, PECO here claimed and was granted the *prospective* operating, maintenance, and depreciation expenses associated with these facilities.

### B. PECO's Appeal—Net Negative Salvage Expense

PECO next challenges the Commission's reduction of its claim for net negative salvage of $3,463,000, by $1,939,000, representing insurance, sale and relocation proceeds obtained by PECO from third parties as the result of early retirement of assets. The Commission contends that this adjustment properly causes the flow-through to ratepayers of amounts recovered by PECO from retired assets. PECO claims that the adjustment prevents it from fully recovering its investment in the assets in question and thereby unconstitutionally confiscates its property.

Net negative salvage is a component of a utility's annual depreciation expense; it is the amount of money by which the cost to a utility of removing retired property exceeds that property's salvage value, if any. It is the Commission's practice in determining a utility's net salvage allowance to average the most recent five years of a utility's actual net salvage. If net salvage is negative, it is added to the utility's annual depreciation expense.

The present case is clearly controlled by our decision in *T.W. Phillips Gas and Oil Co. v. Pennsylvania Public Utility Commission,* 81 Pa. Commonwealth Ct. 205, 474 A.2d 355 (1984). In *T.W. Phillips,* the utility in calculating its net salvage excluded $401,044 which it had received from the sales of depreciable property during the five-year period prior to the conclusion of the test year. It is true that a utility is entitled to recover the cost of its property devoted to the public service; however, the utility must prove that it has not received revenues sufficient to pay its operating expenses and to provide it a fair return during the years when the deficiency was created. PECO, as the utility in *T.W. Phillips,* has not pointed

to any evidence which demonstrates that this condition existed.

PECO argues that *T.W. Phillips* has no application to this proceeding because unlike the gas utility in that case, PECO does not allege a depreciation deficiency. We disagree. PECO is essentially making the same claim as the utility in *T.W. Phillips;* it asserts that it has not fully recovered its investment in the assets in question.

PECO also alleges that the Commission failed to correct an error in the calculation of its adjustment to net salvage; that the Commission should have based its adjustments on average third-party payments for a five-year period ending October 31, 1983, rather than December 31, 1982, and that this would have resulted in an adjustment of $469,000 less than that made by the Commission. The adjustment adopted by the Commission was in accordance with the testimony of Thomas Knudsen, an OCA witness. Mr. Knudsen relied on data for calendar years 1978 through 1982, since PECO's original filing was based on that five-year period. PECO cites no authority for its proposition that the Commission must only use data as of the end of the test year. The Commission tells us in its brief, without dispute by PECO, that it is not uncommon for adjustments to be made on calendar year data, especially when multi-year data is employed, because data on that basis is usually more readily available than data geared to the random test year chosen by the utility in a particular proceeding. Indeed, PECO presented calendar five-year data in its original filing. Furthermore, calculating net salvage based on a five-year average is a device which automatically accounts for anticipated annual fluctuations, and is inherently not a completely accurate figure with respect to the actual annual expense. The five-year period levels out any abnormalities which may exist in a given year.

We hold that the Commission's adjustment to net negative salvage was proper.

### C. PECO's Appeal—Accrued Interest on Long Term Debt

PECO next argues that the Commission's decision to reduce its cash working capital claim by $15,800,000 to reflect the time lag between the receipt of revenues and the payment of interest to bondholders was not supported by substantial evidence. The Commission's adjustment was based upon the testimony of expert witnesses presented by the Commission's trial staff and the OCA. Trial staff witness George F. Markovci testified as follows:

> The rates paid by PECO customers include a revenue allowance to service debt. These rates are collected on a continuous basis throughout the year. In the case of bonds, the major portion of the interest is paid semi-annually. If revenue collected from customers but not yet paid to bondholders is not recognized as a source of working capital contributed by the ratepayer and correspondingly offset against the [cash working capital] allowance, then the common equity holders will earn a return on capital not supplied by them and will thus receive a supplemental return. [PECO] recognizes this principle in its revenue-expense lag study for tax revenues received in advance of payment. There is no valid basis for ignoring this same principle when dealing with funds collected to service debt when the funds are paid out a considerable period after their collection.

This court has on numerous occasions reviewed Commission orders reducing a utility's cash working capital claim on account of accrued bond interest.

*Philadelphia Electric Co. v. Pennsylvania Public Utility Commission,* 61 Pa. Commonwealth Ct. 325, 338, 433 A.2d 620, 627 (1981); *Pennsylvania Electric Co. v. Pennsylvania Public Utility Commission,* 53 Pa. Commonwealth Ct. 186, 193-94, 417 A.2d 819, 823 (1980); *Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission,* 52 Pa. Commonwealth Ct. 201, 205-06, 415 A.2d 937, 939 (1980); *UGI Corporation v. Pennsylvania Public Utility Commission,* 49 Pa. Commonwealth Ct. 69, 81, 410 A.2d 923, 930 (1980). In each of these cases, the utility sought to exclude an amount set aside to pay interest on long term debt from cash working capital. In all of these cases, the Commission disallowed the exclusions, and each order was upheld by this court.

PECO contends that our decision in *T.W. Phillips Gas and Oil Co. v. Pennsylvania Public Utility Commission,* 81 Pa. Commonwealth Ct. 205, 474 A.2d 355 (1984), is determinative of this issue. In that case, the Commission excluded an amount of accumulated interest from its cash working capital analysis which the utility sought to include. In the utility's appeal to this court, we vacated the Commission's order and remanded the matter to determine if the utility had in fact received revenues for the payment of interest on its debts before it was required to pay the interest. Just as the utility in *T.W. Phillips,* PECO is alleging that it does not collect revenue from ratepayers in advance of interest payments to bondholders. On remand to the Commission in *T.W. Phillips,* the Commission reaffirmed its prior adjustment to cash working capital and stated as follows:

> Although Phillips argues that it has paid interest on debt prior to receipt of revenues, it has not produced evidence which would show that the company has collected insufficient revenues, through rates, to pay interest on debt

prior to the inclusion of the debt costs in a rate proceeding.

*Pennsylvania Public Utility Commission v. T.W. Phillips Gas and Oil Co.,* Docket No. 4-811615 (filed May 30, 1984).

Just as the utility in *T.W. Phillips,* PECO did not present adequate evidence indicating that payment of interest on its debt actually preceded the collection of revenues. PECO did not demonstrate that it was able to trace its historical payments of interest to bondholders.

The only evidence adduced by PECO to support its revenue lag claim is that it issued bonds between rate case proceedings whose costs could not have been reflected in rates at the time of the issuance. This fact alone does not justify including the interest due on these bonds in the cash working capital allowance. Because rates are based upon data of a test year, it is inevitable that the timing of a rate request will preclude recognition of costs associated with some bond issuances occurring between rate hike requests by the utility. The Commission has recognized this dilemma and in its order pursuant to our remand in *T.W. Phillips,* it stated:

> The fact of the matter remains that with any new or increased expense incurred by a utility there exists a delay in time before the existence of that expense is recognized expressly in an updated determination of revenue requirement, *i.e.,* in that utility's next general rate case. The Commission's function, however, is not to attempt to 'regulate the unregulated past', so to speak, by incorporating a cash working capital allowance for each such alleged past expense lead or through attempting to assign any particular stream of revenues to a particular incurred expense. Instead, the ratemaking pro-

cess involves the construction of an operating scenario intended to determine that level of revenues which will make the utility seeking increased rates whole on an ongoing, current basis and provide, concomitantly the opportunity for a fair return on common equity investment.

PECO has adduced no evidence showing that it could not meet its expenses, or that its investors were denied a fair rate of return. The Commission's order to include funds earmarked and accumulated for payment as interest to bondholders in PECO's cash working capital figures was substantially supported on the record by the testimony of expert witnesses. In light of our decisions in *UGI, Peoples, Pennsylvania Electric Co.*, and *Philadelphia Electric Co.*, we hold that the Commission's order to reduce PECO's cash working capital claim by $15,800,000 was proper.

### D. PECO's Appeal—Plant In Service

PECO next claims that there is not substantial evidence supporting the Commission's reduction of its claimed utility plant in service by $26,800,000. PECO bases its claim upon actual amounts recorded on its books of account at the end of the 1982 test year and projected additions and retirements during the 1983 future test year. The OCA's witness Knudsen testified to the effect that there was a consistent disparity between PECO's future test year estimate of plant value and the actual value eventually recorded on PECO's books. PECO presented no testimony to rebut the evidence of these consistent disparities between estimated and actual plant in service. In fact, PECO's witness, Thomas C. Hill, testified as follows:

Since common plant additions . . . have exceeded budgeted plant additions, there is a subtraction indicated in the footnote. The final

result shown there of $26,848,000 in my opinion represents a fair estimate of the deviation in original cost plant in service as of June 30, 1983.

. . . .

As I've indicated in my rebuttal testimony to Mr. Knudsen, the company experiences timing differentials as we move throughout the budget year since the budget is cast in 1982, the end of 1982, and the variations will swing as we add additional data. Mr. Knudsen, in his original testimony, recommended an adjustment of some $45 million based upon a similar sheet for April. Upon my cross . . . rebuttal I had data available through May which indicated the $45 million dropped, and my recollection is in the neighborhood of $18 to $19 million; and now our number is in the neighborhood—as of June it is approximately $27 million. So as I indicated there is some volatility associated with that. This is the latest data available.

After weighing the evidence, the Commission decided:

[W]e are not convinced that the company has satisfied its burden of establishing that the budgeted expenditures are likely to be completed by the end of the future test year. As noted by the OCA, the record before us clearly supports a conclusion that a variance will continue.

The Commission is granted a wide area of discretion as to the extent and type of adjustments to be made to the utility's rate base. *See UGI,* 49 Pa. Commonwealth Ct. at 79, 410 A.2d at 929. The Commission's discretionary findings and conclusions must be accepted unless they are totally without support

in the record. We may not indulge in the process of weighing evidence and resolving conflicts in testimony. Since there is ample evidence on the record to support the Commission's findings, its reduction of PECO's utility plant in service by $26,800,000 was proper.

A. OCA's Appeal—Nuclear Fuel In Process

The OCA contests the inclusion of $70,850,000 in PECO's rate base representing nuclear fuel investment as a violation of Section 1315 of the Public Utility Code (Code), 66 Pa. C. S. §1315, which provides:

Except for such nonrevenue producing, nonexpense reducing investments as may be reasonably shown to be necessary to improve environmental conditions at existing facilities or as may be required to convert facilities to the utilization of coal, the cost of construction or expansion of a facility undertaken by a public utility producing, generating, transmitting, distributing or furnishing electricity shall not be made a part of the rate base nor otherwise included in the rates charged by the electric utility until such time as the facility is used and useful in service to the public. Except as stated in this section, no electric utility property shall be deemed used and useful until it is presently providing actual utility service to the customers.

The OCA asserts that we should give a broad interpretation to the language of Section 1315. It claims that nuclear fuel investment falls within the definition of ''facility,'' which is defined in the Code to include. ''[a]ll the plant and equipment of a public utility, including all tangible and intangible real and personal property without limitation.'' The OCA rea-

sons that since "facility" encompasses nuclear fuel investment, then such investment cannot be included in PECO's rate base because the nuclear fuel would not be used or useful at any time prior to November 23, 1983, the time when the rates approved in this case were permitted to go into effect.

The facts in the present case are materially identical to those presented to the Pennsylvania Supreme Court in *David M. Barasch v. Pennsylvania Public Utility Commission*, Pa. , A.2d (No. 141 E.D. 1984, filed April 3, 1985). In that case, the OCA contested the Commission's allowance of $39,083,000 invested in nuclear fuel in process in PECO's rate base. The court held:

> The words 'plant' and 'equipment' contained in the definition of 'facilities,' as set forth in the Code are themselves undefined by the Code. Hence, we are obliged to construe these terms 'according to their common and approved usage' (Statutory Construction Act, 1 Pa. C.S.A. §1903(a)). 'Plant' and 'equipment' do not include, in common and ordinary usage, fuel burned by a utility to generate energy—even though the fuel be nuclear. Accordingly, investment in nuclear fuel does not come within the scope of the act's prohibitory provisions. Nuclear fuel is not a facility and investment in Nuclear fuel is not a cost of construction nor expansion of a facility.

Hence, we will not disturb the Commission's order in this respect.

### B. OCA's Appeal—Land Held for Future Use

The OCA next contests the Commission's inclusion of $7,425,000 in the rate base representing PECO's investment in land for the expansion of existing facili-

ties or the location of future production, transmission, and distribution facilities.

The Commission allowed PECO's claim because the claim met the Commission's established criteria for inclusion in rate base, namely: (1) that the land is held under a definite plan for use in the company's future electric operations; and, (2) the plant will be in service within the next ten years. *See Pennsylvania Public Utility Commission v. Pennsylvania Power Company*, 55 Pa. P.U.C. 552 (1982).

The OCA claims that because the land held for future use would not be in service, and therefore, would not be used or useful during the future test year, it could not be included in the rate base pursuant to Section 1315 of the Code. The Commission has refused to adopt a liberal interpretation of that statute because in its view, the legislation was designed to serve a very limited purpose.

The Commission has noted that Section 1315 of the Code was enacted in an effort to clarify regulatory treatment of construction work in progress at a time when the Commission was faced with rate increase applications from electric facilities whose massive construction programs, notably in the form of nuclear power plants, were undermining their financial viability. The Commission views the statute solely as a means to prevent inclusion in the rate base of the costs of facilities before they are completed and providing service to the public. The statute was not meant to exclude items other than construction work in progress from the rate base. This narrow interpretation of the statute is supported by the circumstances under which it was enacted. We agree with the Commission's interpretation. Additionally, the Commission's interpretation is entitled to great weight. *Chappell v. Pennsylvania Public Utility Com-*

*mission,* 57 Pa. Commonwealth Ct. 17, 425 A.2d 873 (1981).

We hold that the Commission was correct in including amounts representing investment in land held for future use in PECO's rate base.

### C. OCA's Appeal—Transmission Plant Construction Work In Progress

Finally, the OCA contests the inclusion in the rate base of $20,873,000 representing PECO's system reinforcement of its transmission plant construction work in progress (CWIP), claiming that Section 1315 of the Code forbids such CWIP in the rate base because it does not fall within the exception to the exclusion from rate base of CWIP for investments in environmental, safety or conversion facilities. The OCA also claims that there was not substantial evidence to support the Commission's finding that this item fell within the exception for safety improvements at existing facilities.

The exception contained in Section 1315 of the Code states as follows:

> Except for such non-revenue producing, non-expense reducing investments as may be reasonably shown to be *necessary to improve* environmental conditions at existing facilities or improve *safety at existing facilities* or as may be required to convert facilities to the utilization of coal . . . (Emphasis supplied.)

At the hearing before the ALJ, PECO witness Hill testified in rebuttal as follows:

> In addition, of the previously described $113,055,000 in budget plant additions, $10,-693,000 is related to environmental projects or nuclear safety at steam production facilities and $20,873,000 is related to system reinforcement of transmission plant. Thus, $31,566,000

of the budgeted additions meet the traditional regulatory standard for non-revenue producing/non-expense reducing plant. This investment, which will be in service within six months following the end of the test year, should be permitted rate base treatment even if [PECO's] attrition adjustment is not approved.

In Appendix F to Mr. Hill's testimony, marked as PECO Exh. No. 7, TR-ALJ-TPH-27, a description of the projects relating to system reinforcement was set forth as follows:

| Account | Designation | Item # | Description | Amount ($1,000) |
|---|---|---|---|---|
| 352 | Plymouth | 714001 | Limerick 230 kV Line 4/84 | $19,918 |
| 353 | | 014602 | Cromby 230-69 kV | 250 |
| 353 | | 114602 | Grays Ferry Sub-230 kV | 460 |
| 354 + 356 | | 915301 | Whitpain-Warrington 230 kV | 245 |

TOTAL $20,873

In his Recommended Decision, the ALJ stated as follows:

The 'anti-CWIP' statute permits the continuing recognition of this kind of claim; the claim is substantiated by PECO Ex. TPH-27 and witness Hill's testimony and is therefore approved . . . [as a claim that is permitted by 66 Pa. C. S. §1315].

In adopting the ALJ's recommendation, the Commission stated as follows:

We agree with ALJ Shane's rationale and recommendation that [PECO's] claim is proper and should be adopted herein. Moreover, as noted by PECO [Reply Exceptions, p. 9] the 'transmission plant' referred to by the OCA is more accurately discribed [sic] as an investment in the reinforcement of the transmission system, for safety and reliability reasons.

As is evident, the Commission concluded that the reinforcement of transmission plant fell within the exception of Section 1315 of the Code relating to improvement of safety at existing facilities. We have tried to make a careful search in the original record, including the notes of Mr. Hill's testimony, and we have found and read Exh. TPH-27 and we can find no description of the nature of the work entailed in reinforcing the transmission system, the purpose of such work beyond what is imported by the word reinforcement, or other than by slender inference how the work is related to safety. The original record has come to us in four cartons. We are unable to find evidence more substantial than that which we have recorded; however, we are unwilling to overturn the Commission's finding that this item was related to safety out-of-hand not only because the amount involved is significant but also because the Commission and indeed the parties are plainly better versed in the mechanics and lexicon of the electric utility industry than we. It may be that the words "reliability" and "reinforcement" have second or third meanings in the industry importing safety sufficiently to support the Commission's finding. For these reasons we will not reverse the Commission's order including this item in PECO's rate base, but we will remand the record for a definitive finding whether this item was necessary to improve safety at existing facilities and to explain the basis in the record or otherwise for that finding.

We vacate and remand the Commission's order insofar as it allows inclusion in the rate base of items #714001, 014602, 114602, 915301, totalling $20,873,000, appearing in PECO Exh. No. 7-ALJ-TPH-27; the Commission's order is otherwise affirmed. Jurisdiction is relinquished.

ORDER IN 44 C.D. 1984

AND Now, this 11th day of December, 1985, the Pennsylvania Public Utility Commission's order, dated November 23, 1983, is affirmed.

ORDER IN 3561 C.D. 1983

AND Now, this 11th day of December, 1985, the Pennsylvania Public Utility Commission's order, dated November 23, 1983 insofar as it ordered the inclusion in Philadelphia Electric Company's rate base of the amount of $20,873,000 representing system reinforcement of transmission plant, is vacated and the record is remanded for a definitive finding consistent with our opinion herein. In all other respects, the Commission's order is affirmed. Jurisdiction is relinquished.

DISSENTING OPINION BY PRESIDENT JUDGE CRUMLISH, JR.:

I respectfully dissent from that portion of the majority opinion which upholds the Public Utility Commission's exclusion of $41,400,000 in pollution control expense depreciation from Philadelphia Electric Company's test-year rate structure. The total monetary outlay of $285,000,000 is extraordinary and nonrecurring as to the plants affected, and therefore recovery through depreciation is justified under the principle set forth in *Pike County Light & Power Co. v. Pennsylvania Public Utility Commission*, 87 Pa. Commonwealth Ct. 451, 487 A.2d 118 (1985). I would, accordingly, reverse the Commission's order on this point.

Judge DOYLE joins in this dissent.