**Irwin A. POPOWSKY, Consumer Advocate, Petitioner**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 6, 2010.

Decided Jan. 21, 2011.

Diane E. Dusman, Senior Assistant Consumer Advocate, Harrisburg, for petitioner.

Heidi L. Wushinske, Assistant Counsel, Harrisburg, for respondent.

Thomas T. Niesen, Harrisburg, for intervenor The Newtown Artesian Water Company.

BEFORE: McGINLEY, Judge, BROBSON, Judge, and QUIGLEY, Senior Judge.

OPINION BY Judge BROBSON.

The Office of Consumer Advocate (OCA) petitions for review of an order of the Pennsylvania Public Utility Commission (PUC), dated April 15, 2010. The PUC authorized Newtown Artesian Water Company (NAWC) to supplement its tariff for water service with an automatic rate adjustment mechanism to recover increases in purchased water expense, referred to as a "Purchased Water Adjustment Clause" (PWAC). The principal issue in this case is whether the PUC has authority under Section 1307(a) of the Public Utility Code (Code), 66 Pa.C.S. § 1307(a), to allow NAWC to implement the PWAC.

NAWC provides public water service to upwards of 10,000 residential, commercial, industrial, public, and fire protection customers in Newtown Borough, Newtown Township, and a portion of Middletown

Township, Bucks County. NAWC purchases about 57% of its water supply from the Bucks County Water and Sewer Authority (BCWSA). In 2008, NAWC's purchased water expense accounted for approximately 24% of its annual revenue and 34% of its operations and management expenses.

NAWC has a purchased water agreement with BCWSA that was entered into in June 1984 and has a term of at least forty years. The agreement requires NAWC to purchase a minimum of one million gallons per day and gives BCWSA the right to modify its rate and rate structure at any future time, at its sole discretion, and without notice. The rates that BCWSA charges NAWC are affected by BCWSA's own internal budget and the water supply rates that BCWSA pays to its own water supplier, the City of Philadelphia.

BCWSA has increased its purchased water rate six times since the inception of the agreement.[1] Most recently, BCWSA increased NAWC's purchased water rate on July 1, 2008, from $2.15 per 1,000 gallons to $2.68 per 1,000 gallons, an increase of approximately $244,000 annually. Although NAWC filed for a base rate increase after it received notice of BCWSA's increase, there was a 243–day lag between the dates that the new BCWSA purchased water rates became effective and when NAWC was able to reflect the increase in its base rate, resulting in a lost purchased water expense of approximately $207,000.

Because of the delay between the date that an increase in BCWSA's purchased water rate becomes effective and the date that NAWC is able to reflect the increase in its base rate, NAWC filed Supplement No. 68 to Tariff Water—Pa.P.U.C. No. 9 on July 1, 2009, requesting the PUC's approval to implement the PWAC.[2] The PWAC would allow NAWC to recover, through a surcharge, the difference between the cost of purchased water reflected in NAWC's most recent general base rate and any subsequent increases in BCWSA's purchased water rate.[3]

On July 24, 2009, OCA filed a formal complaint against Supplement No. 68 and the matter was assigned to an Administrative Law Judge (ALJ). An evidentiary hearing was held before the ALJ on De-

1. During the first eighteen years of the agreement, BCWSA increased its rates two times for a total of $0.35 per 1,000 gallons—$0.20 per 1,000 gallons in 1993 and $0.15 per 1,000 gallons in 1995. Between 2002 and 2008, however, BCWSA increased its purchased water rate four times for a total of $1.23 per 1,000 gallons—$0.20 per 1,000 gallons in 2002, $0.25 per 1,000 gallons in 2004, $0.25 per 1,000 gallons in 2005, and $0.53 per 1,000 gallons in 2008.

2. NAWC's tariff supplement filed July 1, 2009, was originally designated as Supplement No. 67 and was to become effective September 1, 2009. By letter dated July 16, 2009, NAWC notified the PUC that Supplement No. 67 should be designated as Supplement No. 68. On August 27, 2009, the PUC suspended the effective date of Supplement No. 68 until March 1, 2010, pursuant to Section 1308(b) of the Code, 66 Pa.C.S. § 1308(b). On October 19, 2009, NAWC filed Supplement No. 71, voluntarily extending the effective date of Supplement No. 68 to April 15, 2010. On April 12, 2010, NAWC filed Supplement No. 75, voluntarily extending the effective date of Supplement No. 68 to April 16, 2010.

3. Pursuant to the reconciliation procedure set forth in Section 1307(e) of the Code, NAWC would be required to file an annual report with the PUC chronicling the total expenses incurred as a result of increased purchased water cost and the total revenues received under the PWAC. If total expenses exceed total revenues, i.e., an undercollection, NAWC would be entitled to additional recovery from customers. If total revenues exceed total expenses, i.e., an overcollection, customers would be entitled to a refund from NAWC. See Section 1307(e) of the Code.

cember 15, 2009. By recommended decision dated January 25, 2010, the ALJ recommended that NAWC be allowed to implement the PWAC. Specifically, the ALJ found that Section 1307(a) of the Code permits authorization of the PWAC. In addition, the ALJ recommended that the surcharge be capped at 3% of billed revenue. NAWC, OCA, and the PUC's Office of Trial Staff filed exceptions to the Recommended Decision.

On April 15, 2010, the PUC authorized NAWC to implement the PWAC with the following safeguards: (1) "the [PWAC] implemented by [NAWC] shall not exceed three percent (3%) of the amount billed to customers, exclusive of the amounts recovered under the State Tax Adjustment Surcharge," (Reproduced Record (R.R.) at 538a); (2) "[NAWC] shall impute interest on any overcollections of the [PWAC] at the residential mortgage lending rate," (R.R. at 539a); and (3) "[f]ollowing the resolution of a base rate proceeding, the PWAC will be reset to zero as the prudent purchased water expenses that had been collected in the PWAC are incorporated into base rates" (R.R. at 536a).[4] The PUC

determined that implementation of the PWAC under Section 1307(a) of the Code was consistent with this Court's holding in *Popowsky v. Public Utility Commission,* 869 A.2d 1144, 1160 (Pa.Cmwlth.2005), *appeal denied,* 586 Pa. 761, 895 A.2d 552 (2006) (*Popowsky 2005* ), where we stated: "a Section 1307(a) [of the Code] automatic rate adjustment is appropriate where expressly authorized, ... *or for easily identifiable expenses that are beyond a utility's control." Popowsky 2005,* 869 A.2d at 1160 (emphasis added). This petition for review followed.

■■■ On appeal,[5] OCA argues, *inter alia,* (1) that the PUC does not have authority under Section 1307(a) of the Code to allow NAWC to implement the PWAC, and (2) that the PWAC constitutes impermissible single-issue ratemaking. We address these issues in order.

■■■ In Pennsylvania, public utilities generally recover the costs of providing service through base rates established pursuant to Section 1308 of the Code, 66 Pa.C.S. § 1308.[6] Notwithstanding Section

---

4. NAWC did not seek review of the PUC's April 15, 2010 order. The propriety of the safeguards imposed by the PUC, therefore, is not before this Court.

5. This Court's scope of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. 2 Pa.C.S. § 704. The PUC's interpretation of its governing statute must be given great weight and deference and will not be reversed unless clearly erroneous. *Popowsky v. Pub. Util. Comm'n,* 550 Pa. 449, 462, 706 A.2d 1197, 1203 (1997) (*Popowsky 1997* ). "Judicial deference is even more necessary when the statutory scheme is technically complex." *Id.* at 462, 706 A.2d at 1203. Furthermore, where a matter has been left solely within an administrative agency's discretion, this Court will interfere only if "there has been a manifest and flagrant abuse of discretion or a

purely arbitrary execution of the agency's duties or functions." *Slawek v. State Bd. of Med. Educ. & Licensure,* 526 Pa. 316, 321, 586 A.2d 362, 365 (1991) (quoting *Blumenschein v. Pittsburgh Hous. Auth.,* 379 Pa. 566, 572–73, 109 A.2d 331, 334–35 (1954)).

6. Section 1308 of the Code, relating to voluntary changes in rates, provides, in part:

(a) **General rule.**—Unless the commission otherwise orders, no public utility shall make any change in any existing and duly established rate, except after 60 days notice to the commission, which notice shall plainly state the changes proposed to be made in the rates then in force, and the time when the changed rates will go into effect. The public utility shall also give such notice of the proposed changes to other interested persons as the commission in its discretion may direct.... All proposed changes shall be shown by filing new tariffs, or supple-

1308 of the Code, however, the General Assembly has expressly authorized utilities to recover certain costs through the use of surcharges[7] under Section 1307(a) of the Code. *Popowsky 2005*, 869 A.2d at 1154. Section 1307(a) of the Code provides, in pertinent part:

(a) **General rule.**—Any public utility ... may establish a sliding scale of rates or such other method for the automatic adjustment of the rates of the public utility as shall provide a just and reason-

able return on the rate base of such public utility, to be determined upon such equitable or reasonable basis as shall provide such fair return.

In addition to this general rule, Section 1307 also sets forth specific automatic adjustment mechanisms for fuel costs, distribution system improvement projects, and certain taxes.[8] Sections 1307(c), (f), (g), and (g.1) of the Code. Regardless of the recovery method used, Section 1301 of the

ments to existing tariffs filed and in force at the time. . . .

(b) **Hearing and suspension of rate change.**—Whenever there is filed with the commission by any public utility any tariff stating a new rate, the commission may, ... enter upon a hearing concerning the lawfulness of such rate, and pending such hearing and the decision thereon, the commission ... may, at any time before it becomes effective, suspend the operation of such rate for a period not longer than six months from the time such rate would otherwise become effective, and an additional period of not more than three months pending such decision. . . .

(c) **Determination.**—If, after such hearing, the commission finds any such rate to be unjust or unreasonable, or in anywise in violation of law, the commission shall determine the just and reasonable rate to be charged or applied by the public utility for the service in question, and shall fix the same by order to be served upon the public utility and such rate shall thereafter be observed until changed as provided by this part.

(d) **General rate increases.**—Whenever there is filed with the commission ... any tariff stating a new rate which constitutes a general rate increase, the commission shall promptly enter into an investigation and analysis of said tariff filing and may ... enter upon a hearing concerning the lawfulness of such rate, and the commission may ... permit such tariff to become effective, except that absent such order such tariff shall be suspended for a period not to exceed seven months from the time such rate would otherwise become effective. Before the expiration of such seven-month period, a majority of the members of the commission serving in accordance with law, acting

unanimously, shall make a final decision and order, setting forth its reasons therefor, granting or denying, in whole or in part, the general rate increase requested. If, however, such an order has not been made at the expiration of such seven-month period, the proposed general rate increase shall go into effect at the end of such period, but the commission may by order require the interested public utility to refund, in accordance with section 1312 (relating to refunds), to the persons in whose behalf such amounts were paid, such portion of such increased rates as by its decision shall be found not justified, plus interest ... during the period or periods for which the commission orders refunds. The rate in force when the tariff stating such new rate was filed shall continue in force during the period of suspension unless the commission shall grant extraordinary rate relief as prescribed in subsection (e). . . .

7. As this Court stated in *Popowsky 2005*:

A surcharge is an amount added to a customer's regular bill that is established outside the normal ratemaking procedure. The surcharge is imposed pursuant to an "automatic adjustment clause" in a utility's approved tariff. The surcharge allows the add-on of expenses and changes to those expenses without including any profit or other recovery; this add-on is known as 'dollar for dollar' recovery.

*Popowsky 2005*, 869 A.2d at 1152 (citations omitted).

8. It is undisputed that none of the specific automatic adjustment mechanisms set forth in the subsections of Section 1307 of the Code are applicable in this case.

Code, 66 Pa.C.S. § 1301, mandates that "[e]very rate made, demanded, or received by any public utility ... shall be just and reasonable."[9]

Citing our decisions in *Masthope Rapids Property Owners Council v. Public Utility Commission*, 135 Pa.Cmwlth. 437, 581 A.2d 994, 1000 (1990), *Pennsylvania Industrial Energy Coalition v. Public Utility Commission*, 653 A.2d 1336 (Pa. Cmwlth.1995), *affirmed*, 543 Pa. 307, 670 A.2d 1152 (1996) (*PIEC*), and *Popowsky 2005*, OCA argues that the PUC erred in allowing NAWC to implement the PWAC because the General Assembly has not expressly authorized the recovery of increases in purchased water expense through the use of an automatic adjustment clause. OCA further contends that automatic adjustment clauses submitted pursuant to Section 1307(a) of the Code are "not to be employed as a universally available alternative to a base rate case," *Popowsky 2005*, 869 A.2d at 1160, and that allowing utilities to recover purchased water expense through a surcharge would "disassemble the traditional rate-making process." *PIEC*, 653 A.2d at 1349.

In *Masthope*, a water utility sought to utilize a surcharge under Section 1307(a) of the Code to fund principal and interest payments on a loan financed under the Water Facilities Restoration Act (Water Act), 32 Pa.C.S. §§ 7501–7518. Explaining that the Code must be read *in pari materia* with the Water Act, this Court set out to determine whether Section 1307(a) of the Code was consistent with the requirements of the Water Act. Specifically,

[Section 7518 of] the Water Act provides that only rate requests which are *necessary and appropriate* for recovery of Water Act Loan principal and interest are to be approved by the PUC. In addition, [Section 7518 of the Water Act provides that the PUC] may only approve rate increases which are necessary solely to accomplish the repayment of loans made pursuant to the Water Act.

*Masthope*, 581 A.2d at 1000 (emphasis added). Because Section 1307(a) of the Code does not provide the "necessary and appropriate" review required by Section 7518 of the Water Act prior to implementation of the surcharge, this Court held that a surcharge was not available to recover Water Act loan payments. We reasoned:

[T]he very function of the typical automatic adjustment clause is to permit rapid recovery of a specific *identifiable* expense item, with a more comprehensive analysis upon reconciliation of actual costs with previously projected costs used to establish the effective rate. The initial process is essentially a mathematical review of the projections provided by the public utility. Therefore, there is no initial review to determine the appropriateness or necessity of the rate request. Again, this is inconsistent with the Water Act requirement of a review of the rate request to ensure it for the limited purpose of recovering of Water Act loan monies.

*Id.* (emphasis in original). In other words, this Court determined that, in order for the Code and the Water Act to be construed consistently, Water Act loan pay-

---

9. The burden of establishing that the rate involved is "just and reasonable" rests with the public utility pursuant to Section 315(a) of the Code, 66 Pa.C.S. § 315(a), which provides:

(a) **Reasonableness of rates.**—In any proceeding upon the motion of the commis- sion, involving any proposed or existing rate of any public utility, or in any proceedings upon complaint involving any proposed increase in rates, the burden of proof to show that the rate involved is just and reasonable shall be upon the public utility.

ments could be recovered only in a base rate case under Section 1308 of the Code.

In *PIEC*, this Court addressed the issue of whether Section 1307(a) of the Code permits electric utilities to recover demand-side management (DSM)[10] program costs by surcharge. Rejecting the argument that Section 1307(a) of the Code applied only to costs beyond the control of the utility, such as fuel costs and certain taxes, this Court held that a surcharge was available. Critical to our holding was the statutory authority for the surcharge found in Section 1319 of the Code, 66 Pa.C.S. § 1319.[11] We reasoned:

> Although we agree that Section 1307 [of the Code] should have limited application and the PUC should not use it to disassemble the traditional rate-making process, the General Assembly did not limit the allowance of automatic adjustment to only fuel costs and taxes which are generally beyond the control of the utility. Instead, the General Assembly specifically allowed the recovery of fuel costs and also allowed the PUC or the utilities to initiate the automatic adjust-

ment of costs within specific procedures. Unlike in *Masthope*, in this case, Section 1319 of the Code specifically states that all prudent and reasonable costs should be recovered and sets forth requirements that the proposed programs be determined to be "prudent and cost-effective" by the PUC (or the Bureau of Conservation, Economics and Energy Planning as designated by the PUC), before any costs may be recovered through the surcharge mechanism.

> Because Section 1319 [of the Code] directs the PUC to allow recovery of all prudent and reasonable costs for developing, managing, financing and operating DSM programs and because Section 1307 [of the Code] gives the PUC the discretion to establish by either regulations or order the manner in which automatic adjustment recovery may be instituted and when such automatic adjustment of rates should be mandated, the surcharge method is permitted.

*PIEC*, 653 A.2d at 1349. Accordingly, this Court held that, to the extent expressly

---

**10.** As this Court explained in *PIEC*:

> DSM is a term of art to describe plans to decrease the demand for energy and promote conservation at a cost less than that of increasing supply. DSM programs are intended to alter the customer's use of electricity by persuading them to use less energy and to consume less energy for the same hours of operation when the hours cannot be reduced.... Utility DSM programs may provide the benefits of postponing the need for additional electric generating facilities, reducing consumption of non-renewable fuel, increasing cost competitiveness and improving environmental conditions.

*PIEC*, 653 A.2d at 1340.

**11.** Section 1319 of the Code provides, in pertinent part:

> **(a) Recovery of certain additional expenses.**—If:
>> (1) a natural gas or electric public utility elects to establish a conservation or load management program and that program

is approved by the commission after a determination by the commission that the program is prudent and cost-effective; or
>> (2) the commission orders a natural gas or electric public utility to establish a conservation or load management program that the commission determines to be prudent and cost-effective:

> the commission shall allow the public utility to recover all prudent and reasonable costs associated with the development, management, financing and operation of the program, provided that such prudent and reasonable costs shall be recovered only in accordance with appropriate accounting principles....

> **(b) Option for recovery.**—The commission may consider allowing the recovery of those costs permitted to be recovered by subsection (a) through charges to those persons who are participants in the financing program.

authorized by Section 1319 of the Code, a surcharge under Section 1307(a) of the Code could be utilized to recover DSM program costs.[12]

Finally, in *Popowsky 2005*, a utility sought to implement a surcharge under Section 1307(a) of the Code to fund infrastructure improvements to its wastewater collection systems. This Court held that a surcharge could not be used to fund capital improvements unless expressly authorized by the General Assembly. Central to our holding were the decisions in *Masthope* and *PIEC* and the "used and useful" principle enunciated in Section 1315 of the Code, 66 Pa.C.S. § 1315.[13] We reasoned:

> *Masthope* and *PIEC* teach that the "cursory" review undertaken for a surcharge is not a substitute for the review undertaken in a base rate case to determine whether a rate is just and reasonable. *Masthope*, 581 A.2d at 1001. With respect to capital cost recovery, that review requires a utility to prove that those costs were incurred for used and useful facilities. Those costs may not be recovered *"until such time* as the facility is used and useful in service to the public." *PIEC*, 653 A.2d at 1346 (emphasis added). That time is in a Section 1308 [of the Code] base rate proceeding.
>
> . . . .
>
> Because a Section 1307(a) [of the Code] surcharge provides no opportunity for a utility to demonstrate that its system improvements are both used and useful prior to recovering these capital costs, this surcharge cannot be used to fund capital improvements.

*Popowsky 2005*, 869 A.2d at 1156–57.[14] Concluding our discussion in *Popowsky*

---

**12.** Although this Court approved the use of a surcharge in *PIEC*, we limited recovery to non-capital expenses, holding that the "used and useful" principle enunciated in Section 1315 of the Code, 66 Pa.C.S. § 1315, prevented utilities from recovering capital expenses by surcharge, even those related to DSM requirements. We explained:

> Because new physical facilities are appropriate costs only within the rate base under Section 1315 [of the Code], in the unlikely event that DSM programs require new physical facilities, those costs should be raised in a base rate case only, subject to the restrictions of Section 1315, and not through the surcharge mechanism.

*PIEC*, 653 A.2d at 1347; *see also* Section 1319 of the Code ("Nothing in this section shall permit the recovery of costs in a manner prohibited by section 1315 [of the Code].").

**13.** Section 1315 of the Code provides, in pertinent part:

> [T]he cost of construction or expansion of a facility undertaken by a public utility producing, generating, transmitting, distributing or furnishing electricity shall not be made a part of the rate base nor otherwise included in the rates charged by the electric utility until such time as the facility is used and useful in service to the public.

While Section 1315 of the Code applies by its own terms only to electric utilities, "our Supreme Court has held that the principle codified in Section 1315 [of the Code], i.e., that a utility may not recover costs of facilities not presently used and useful in providing services, applies to all Pennsylvania utilities." *Popowsky 2005*, 869 A.2d at 1157 (citing *Barasch v. Pub. Util. Comm'n*, 516 Pa. 142, 169, 532 A.2d 325, 338 (1987) ("[N]o utility of any type is permitted, without express and valid legislative authorization, to charge ratepayers for property which is not used and useful in the production of current utility service.")).

**14.** This Court went on to explain in *Popowsky 2005* that "the General Assembly has authority to exempt utilities from making the used and useful demonstration before recovering its capital expenditures," as it did by enacting Section 1307(g) of the Code. *Id.* at 1158. Section 1307(g) of the Code provides:

> **(g) Recovery of costs related to distribution system improvement projects designed to enhance water quality, fire protection reliability and long-term system viability.—** Water utilities may file tariffs establishing a sliding scale of rates or other method for the automatic adjustment of the rates of the

*2005,* we summarized this Court's interpretation of Section 1307(a) of the Code as follows:

> Rate adjustments, or surcharges, submitted pursuant to Section 1307(a) [of the Code] are limited in scope and not to be employed as a universally available alternative to a base rate case. As we have previously held, *a Section 1307(a) [of the Code] automatic rate adjustment is appropriate where expressly authorized, as in 66 Pa.C.S. § 1307(g), or for easily identifiable expenses that are beyond a utility's control, such as tax rate changes or changes in the costs of fuel.*

*Id.* at 1160 (emphasis added).

Based on the foregoing cases, and keeping in mind that the PUC's interpretation of the Code will not be disturbed unless clearly erroneous, *Popowsky 1997,* 550 Pa. at 462, 706 A.2d at 1203, we find that the PUC has authority under Section 1307(a) of the Code to allow NAWC to implement the PWAC. While we recognize that a base rate filing under Section 1308 of the Code is the preferred method for a public utility to recover the costs of providing service, we cannot ignore the fact that the General Assembly envisioned the automatic adjustment of rates in enacting Section 1307(a) of the Code.

That the General Assembly did not expressly authorize a surcharge to recover increases in purchased water expense is not dispositive. The only statutory requirement contained in Section 1307(a) of the Code is that the surcharge "provide a just and reasonable return on the rate base of [the] public utility, to be determined upon such equitable or reasonable basis as shall provide such fair return." Section 1307(a) of the Code. *Masthope, PIEC,* and *Popowsky 2005* support the proposition that surcharge recovery is available under Section 1307(a) of the Code (1) where expressly authorized by the General Assembly, *or* (2) where an expense is easily identifiable and beyond the utility's control. The basis for this distinction lies with the PUC's review under Section 1307(a) of the Code, which this Court described in *Masthope* as follows:

> [T]he [PUC]'s review is appropriately characterized as preliminary and cursory. Indeed, the very function of the typical automatic adjustment clause is to permit rapid recover of a specific, *identifiable* expense item, with a more comprehensive analysis upon reconciliation of actual costs with previously projected costs used to establish the effective rate. The initial process is essentially a mathematical review of the projections provided by the public utility.

*Masthope,* 581 A.2d at 1000 (emphasis in original). Only where the "mathematical" review performed under Section 1307(a) of the Code is inadequate to determine whether a surcharge is "just and reasonable," [15] is express statutory authority required for surcharge recovery.

For instance, in *Masthope, Popowsky 2005,* and *PIEC,* this Court held that a surcharge was not available under Section

---

water utility as shall provide for recovery of the fixed costs (depreciation and pretax return) of certain distribution system improvement projects, as approved by the commission, that are completed and placed in service between base rate proceedings. The commission, by regulation or order, shall prescribe the specific procedures to be followed in establishing the sliding scale or other automatic adjustment method.

We held, however, that Section 1307(g) of the Code was limited to "distribution system improvement projects designed to enhance water quality," and did not authorize the use of a surcharge to recover the costs of system improvement projects by electric, natural gas, steam, and wastewater utilities.

15. Section 1301 of the Code, 66 Pa.C.S. § 1301.

1307(a) of the Code in the absence of express statutory authority. With respect to the Water Act loan payments in *Masthope*, the PUC's review under Section 1307(a) of the Code is inadequate because the PUC cannot determine whether a proposed surcharge is "just and reasonable" without first determining whether the surcharge is "necessary and appropriate" for Water Act loan purposes. Without this initial determination, ratepayers may be required to pay a surcharge that is not "necessary and appropriate" for recovery of Water Act loan payments. Such a surcharge would not be "just and reasonable."

Likewise, regarding the capital costs in *Popowsky 2005*, the PUC's review under Section 1307(a) of the Code is inadequate because the PUC cannot determine whether a surcharge is "just and reasonable" without first determining whether the surcharge is for costs incurred for "used and useful" facilities. Without this initial determination, ratepayers may be required to reimburse a utility for capital improvements that are neither used nor useful. Such a surcharge would also not be "just and reasonable."

Finally, concerning the DSM program costs in *PIEC*, it is apparent from the language of Section 1319 of the Code—which expressly authorizes a surcharge for certain DSM program costs—that the General Assembly did not consider the PUC's review under Section 1307(a) of the Code adequate to determine whether a surcharge for the recovery of DSM program costs was "just and reasonable." Tellingly, utilities can recover only for DSM programs that are determined by the PUC to be "prudent and cost-effective." Section 1319(a) of the Code.

Unlike the expenses at issue in *Masthope, Popowsky 2005,* and *PIEC*, the PUC's review under Section 1307(a) of the Code is adequate to determine whether a sur-charge for increases in purchased water expense is "just and reasonable"—*i.e.*, increases in purchased water expense are easily identifiable. The PUC can determine whether the surcharge imposed under the PWAC is "just and reasonable" simply by comparing the cost of purchased water reflected in NAWC's most recent base rate case to any subsequent increases in BCWSA's purchased water rate. In other words, the actual cost of purchased water would be reconciled with the projected cost of purchased water. This is precisely the "mathematical" review described in *Masthope*.

Furthermore, increases in purchased water expense are beyond NAWC's control. The requirement that an expense be beyond the utility's control is a recognition of the principle that a base rate filing under Section 1308 of the Code is the preferred method for utilities to recover the costs of providing service. Generally, where an expense is within a utility's control, that expense can be recovered through a base rate filing. Here, NAWC's purchased water agreement with BCWSA requires NAWC to purchase a minimum of one million gallons per day and gives BCWSA the right to modify its rate at any future time, at its sole discretion, and without notice. That agreement does not expire until June 2024, at the earliest. The situation is further exacerbated by the fact that BCWSA purchases the water it sells to NAWC from the City of Philadelphia. Increases in the rates the City of Philadelphia charges BCWSA, therefore, are passed-through to NAWC. Accordingly, the PUC has authority under Section 1307(a) of the Code to allow NAWC to implement the PWAC because increases in purchased water expense are easily identifiable and beyond NAWC's control.

Importantly, allowing implementation of the PWAC will not act to "disassemble the

traditional rate-making process." *PIEC*, 653 A.2d at 1349. The expense that NAWC seeks to recover under the PWAC—increases in purchased water expense occurring between base rate cases— is not recoverable under Section 1308 of the Code due to the prospective nature of rate setting. *See Phila. Elec. Co. v. Pub. Util. Comm'n*, 93 Pa.Cmwlth. 410, 502 A.2d 722, 727 (1985) ("[T]he utility may not receive retroactive rate relief on account of expense items which are greater than anticipated or of revenue items which are lesser."). While OCA correctly asserts that the current cost of purchased water is reflected in NAWC's present base rate, and that NAWC can reflect future increases in purchased water expense by filing subsequent base rates, OCA ignores the expense that NAWC incurs due to the delay between the date that an increase in BCWSA's purchased water rate becomes effective and the date that NAWC is able to reflect the increase in its base rate. In 2008, that delay resulted in a lost purchased water expense of approximately $207,000. Moreover, the revenue collected under the PWAC cannot exceed three percent of the total amount billed to ratepayers. In order to recover increases in purchased water expense that exceed the three percent cap, therefore, NAWC must file for a base rate under Section 1308 of the Code. Finally, upon the resolution of any base rate filing by NAWC, the costs previously recovered under the PWAC will be incorporated into NAWC's base rate and the PWAC will be reset to zero. The PWAC, therefore, is not being used as a "universally available alternative to a base rate case." *Popowsky 2005*, 869 A.2d at 1160.

We address, next, OCA's contention that the PWAC constitutes impermissible single-issue ratemaking. In *PIEC*, this Court held that the doctrine of single-issue ratemaking does not apply to surcharges under Section 1307 of the Code. We stated:

> Single-issue ratemaking is similar to retroactive ratemaking and, in general, is prohibited if it impacts on a matter that is normally considered in a base rate case. This is, however, not a base rate case. No party has asked for specific recovery of a line item that traditionally would be requested in a rate-making procedure. The PUC applied Section 1307 [of the Code]'s authorization to specifically allow an automatic adjustment of rates outside of the rate-making procedures. Because the surcharge is permitted under the Code, with procedures to determine the reasonableness of the charges outside of a base rate case, the doctrine of single-issue ratemaking is inapplicable.

*PIEC*, 653 A.2d at 1350. Having found that the PUC has authority under Section 1307(a) of the Code to allow NAWC to implement the PWAC, we hold that the PWAC does not constitute impermissible single-issue ratemaking.[16]

Accordingly, we affirm the PUC's order.

### ORDER

AND NOW, this 21st day of January, 2011, the order of the Pennsylvania Public Utility Commission (PUC), dated April 15, 2010, is hereby AFFIRMED.

---

**16.** OCA also argues that the delay and cost involved in a base rate case under Section 1308 of the Code cannot justify a surcharge in lieu of statutory authority for the surcharge under the Code. Having found that the PUC has authority under Section 1307(a) of the Code to allow NAWC to implement the PWAC, we need not address this issue.